GYPSY OIL CO. v. LINDESMITH et al.

No. 19908. Opinion Filed Oct. 20, 1931.

Rehearing Denied Nov. 24, 1931.

James B. Diggs, William C. Liedtke, Russel G. Lowe, Redmond S. Cole, and C. L. Billings, for plaintiff in error.

Sigler & Jackson and G. V. Pardue, for defendants in error.

KORNEGAY, J. This cause started in the district court of Carter county by the filing by William N. Lindesmith, N. J. Lindesmith, and J. T. Clark, as plaintiffs, of a suit against the Gypsy Oil Company, J. A. Heenan, C. E. Sykes. R. W. Coe, Mrs. C. L. Dittman, and Charles Pfile, defendants. on the 31st day of March, 1927. The original petition sets up the fact that the defendants Heenan, Sykes, Coe, Mrs. D¹ttman, and Charles Pfile were tenants in common with the plaintiffs of an undivided 114/160th interest in the land out of which the gas came, over which the suit was had, and avers that they were made defendants because they would not join after request to join in as plaintiffs. There was an averment that the Gypsy Oil Company was operating the land under a lease made on the 9th of July, 1924, a copy of which was attached to the petition. There were various charges made, and, among others, that a provision in the contract was void as being unilateral. There was a further charge that well No. 6, when the lease was made, was producing large quantities of gas, and that on the 7th of May, 1926, it was struck by lightning and destroyed, and that the Gypsy Oil Company had made no effort to replace it.

There was a further charge that on the west side only three wells had been used to offset four wells on the Sturm lease. There was a further charge that the oil company had failed to offset a well on the land to the north, which was known as Johnson No. 5. There was a further charge that well No. 2 had been lost, but they did not know how, and in lieu thereof they had drilled gas well No. 8. There was a further charge that the defendants had been selling this gas from No. 8 to the surrounding leases to various persons, unknown to the plaintiffs, and without accounting to the plaintiffs for the proceeds, and there was a charge as follows:

"* * * Said amount of gas wasted and disposed of by the Gypsy Oil Company amounted to thousands and thousands of dollars."

There was a further charge of negligence in handling well No. 7, and allowing water to get into the sand and forcing its abandonment, and there was a prayer for the cancellation of the lease.

There was a second count divided into several sections, and the first one was based on No. 6 well being permitted to be lost and destroyed. and not being replaced, and that if the defendant had not been guilty of negligence, the plaintiffs would have realized $25,000 from it, and they wanted $25,000 on that account. There was a third subdivision with reference to well No. 7 being ruined, and the failure of the oil company to replace it, and the damages were laid at $20,000 for that. There was another claim for failure to offset the Sturm lease with four wells instead of three, and there was a $20,000 damage alleged for that.

There was an allegation that the Gypsy Oil Company had damaged the plaintiff $2,000 for failure to offset the W. B. Johnson well. There was a further allegation with reference to well No. 8, the gas well which took the place of No. 2, to the effect that a line was run therefrom to supply the residents of Pruitt City, Ratcliff, and various places unknown to the plaintiffs, in which the charge is made that the plaintiffs did not know the amount due, and an accounting was demanded with prayer that the plaintiffs have judgment for $25,000 on this account, and there was a general prayer for $92,000 on count No. 2.

As a third cause of action, it was claimed that the conduct, negligence, and carelessness, complained of in counts Nos. 1 and 2, was done with the wrongful and intentional purposes of damaging the plaintiffs, and was done with a willful, wanton and malicious purpose of injuring and damaging the plaintiffs, and there was $25,000 punitive damages asked for. By amendment it was sought o cancel the lease, but this appears to have be ·n stricken. The lease was set out that was complained of as being unilateral, which was an ordinary oil and gas lease with some additional covenants and clauses, the fourth paragraph of which is as follows:

"Lessee shall pay lessor as royalty for all gas sold, including casinghead gas. a sum equal to one-eighth (1/8th) of the proceeds of such sale, and in case the lessee shall use or utilize such gas otherwise than in operating the premises, to pay lessor as royalty a sum equal to one-eighth (1/8th) of the value of such gas, * * * settlement to be made every three months for the gas sold or utilized during the preceding three months."

Well No. 2 was to be deepened to the depth of the sand from which well No. 5 on the Johnson lease was producing gas, which was approximately 2,415 feet. There was a further agreement that as soon as this was done, the premises were fully developed for oil and gas, and casinghead gas, and the following:

"That thereafter the lessee shall have the exclusive right to determine the nature and extent of the development of the leased premises for oil, gas, and casinghead gas to the depth of such sands."

There was a clause to protect the property as against offsetting wells on adjoining premises producing oil or gas in paying quantities, if the costs and expenses of drilling such well justified the lessee in drilling same. There was a clause permitting the lessee to use, free of cost, gas and oil for operations on the premises. There was a clause forbidding the forfeiture or cancellation for failure to perform in whole or in part any of the lease's implied covenants, conditions, or stipulations until it shall have first been finally judicially determined that such failure exists, and after such final determination lessee is given a reasonable time therefrom to comply with any such covenants, conditions, or stipulations.

The filing of this petition was followed by summons, and the usual motions and demurrers, and an amended petition was filed, and an amendment thereto was added on November 10, 1927, the amendment taking the place of paragraph 5 of the amended petition and containing allegations as to injury of well No. 7, and claiming $20,000 damage.

The Gypsy Oil Company answered on the 22nd of November, 1927, and denied liability, and set up a settlement had in July, 1924, and also the proceedings in a former lawsuit. No. 10179. The defendants Sykes, Heenan, Coe, and Pfile filed demurrers and seem to have passed out and to have taken no further part in the litigation. Reply was filed by way of general denial. The case came on for trial, and there is a motion for judgment on the pleadings made by the defendant oil company and overruled on the 13th of March, 1928, and on the 4th of May, 1928, the trial began.

The plaintiff Clark testified, and at the beginning of his examination the Gypsy Oil Company objected to his testimony on account of the pleadings not showing a cause of action. Plat of the property was introduced and proof made that the plaintiffs owned 53 acres out of the 166 acres, a little less than one-third. A large part of his testimony was addressed to the proposition of the failure to offset and also the abandonment of some of the wells. He claimed in the spring of 1927 he noticed in No. 8 a 2-inch line directly into the well and that he traced it out, and one line of it went out to the Johnson and Sturms and one line forked and went on down to the Morris, and that his boundary line was 300 feet from No. 8, and that Hugh Sturm was pumping off of it. That a line that connected into the 4-inch line went to Pruitt City, and he found this line about 20 days before the suit was filed. That he called on the superintendent about it, and he sent Mr. Shaw up with him to the valve, and that in the argument Shaw claimed that the valve was closed, and the language of the witness is as follows:

"A. He put up the argument it was closed, and I knew it was open, and I asked him to open it, if it was closed, and then I asked him to close it and he turned again and he closed it, and I said, 'What are you using it for without the meter,' and he said, 'They were not using it,' and said, 'They had a 200 pound pressure on there from the Morris.' After he closed the well I asked him if there would be any danger from leaving it closed, and he said there would not and I asked him to leave it closed. Q. Immediately after you had it closed, did you make any investigation as to whether or not any of the pumps that had been operating from this line had closed down for lack of fuel? A. Yes, sir. Q. Where was that? A. Mr. Sturm had no gas next morning to run his oil. Q. After you closed the gate? A. Yes, sir; about three o'clock that evening the pressure went down and this man in his house had no fire or light."

At page 166, he was asked if he made an investigation at Pruitt City after the well was closed as to the gas conditions up there, and this was objected to and withdrawn, but he answered they were out of gas up there. His attention was directed to the destruction of No. 6, and the run sheets were introduced. It developed that he had worked about the wells quite a lot and on the surrounding property, and he turned to No. 5. Effort was made to claim something about No. 4, but it developed that it was not in the pleadings. He was asked about his royalty checks on No. 8, before the time that he came down to cut it off, and the royalty checks afterwards being exhibits 38 to 41. In August, 1926, he received $21.63, in September, $7.73, in November $4.94, and in October $5.10. He said in some months the total check was $60, and that that condition existed up to the present time.

On cross-examination it developed that it was a gate valve with a wheel that turned to shut it. At page 173, he says:

"A. He argued with me the well was shut off and I argued it was not and he said it is shut, and I said if it is shut, open it, and he taken hold of it and closed it down, and the back pressure line was leaking at almost every joint from this well to this well of Mr. Sturm's. Holes blowed out as large as your hand, where it was leaking and wasting, and when he cut it off, this back pressure soon blew out."

At page 174 he says:

"Q. You know if there was any other gas wells hooked up on this line? A. He claimed they were taking 200-pound pressure from the Morris, and I asked him where the gate is on that well, and I said if you are not stealing it from this well, you are stealing it from her well, and I will report it to her to-night. By the Court: Who were you talking to? A. Mr. Shaw. By Mr. Billings (of counsel for defendant): Q. How did you know the Mattie Morris was closed? A. I could tell by looking at the gate. Q. Did you turn it? A. No, sir; and I had witnesses there to see I did not."

With reference to tracing the line, at page 176, he says:

"Q. Did you trace the line any further? A. Yes, sir; it went into a four-inch line there and on over to a meter house, up here (indicating on map). Q. Up here is a meter house? A. Yes, sir. Q. Did you trace the line any further? A. Six and three quarters of a mile. Q. In a northeast direction? A. Yes, sir. Q. Any connection with it, with the line that went on north from there? A. Another line right here somewhere (indicating on map). Q. Across this line (indicating on map)? A. Yes, sir. Q. Into this four-inch line here? A. A line is in there. Q. You don't know if it was connected with the four-inch line or not? A. There was another well there, I don't know. Q. All the distance you traced this four-inch line was three-quarters of a mile north from this Morris? A. No, sir. Q. You did not trace it up to Pruitt City? A. No, sir; just to see where our line went. There was a man up here reading the meter. Q. From three-quarters of a mile up here, you don't know? A. No, sir."

At page 177, the following took place:

"Q. Judging from this map, you traced it to the Lone Star Line? A. They were taking it up here, this Lone Star Line. By the Court: From the place it was connected below the meters, you traced it then to the Lone Star meter? A. No, sir; it was an independent meter house of the Gypsy's. By the Court: Going into the meter house, then? A. Yes, sir. By the Court: How do you know they did not measure it then? A. They probably did. By the Court: How do you know they did not pay you then? A. There were more wells up there, it was more than a mile beyond my place. By Mr. Pardue (of counsel for plaintiffs): Q. And on the two

inch or four-inch line? A. On the four-inch line. By the Court: It was emptied into the general big line before it went to the meter? A. Yes, sir. By the Court: That is right now? A. Yes, sir. By Mr. Billings (of counsel for defendant): Q. This line which was connected with well No. 8, that was connected with the Bradenhead of the well? A. Yes, sir. Q. The center portion of the well was connected to the meter box and went through the Lone Star Meter? A. Yes, sir. Q. That was metered and you received your royalty on that? A. Yes, sir. By the Court: Any difference in gas coming out of the Bradenhead and the main pipe? A. I can't tell. By Mr. Billings (of counsel for defendants): Q. You know anything about gas usually produced from the Bradenhead? A. I know about the pressure. Q. Know anything about the usual source of gas being produced, gas that comes in behind the set of casing? A. I can tell you what it was there. By the Court: How much? A. 250 pounds rock pressure. By the Court: In that line? A. Yes, this two-inch line. By Mr. Billings, (of counsel for defendant): Q. Which line? A. The two-inch line."

He detailed a lot of conversation as to his information as to the gas being off, but most of it was struck out by the court. He stated that Hugh Sturm was using the gas the day it was cut off, but it developed that of his own knowledge he did not know, but the man came to Hugh Sturm's station to get the gas turned on. By the leakage in the joints, he determined concerning the gas in the line, and he based his conclusion on that and their coming up and asking for gas. He claimed that, in January, 1927, the Sturm line was connected up. From this he went to the measurements of the different wells. At page 189 he stated that the increase in the April check from No. 8 occurred after the Bradenhead was connected up with the Lone Star, as the Lone Star was taking it from the overflow as well as the Bradenhead, and that this occurred in February after the line was taken out in January. He was asked about the Bradenhead being used in 1926 from May to December, and about No. 6 and the gas being used in an effort to drill deeper, and his reply was that the Gypsy man told him that when they laid the line there was not sufficient pressure to do anything with it. Being questioned again about the derrick on No. 6, he stated that they set up a steel derrick. He did not say whether in 1927 they ran gas from the Bradenhead to work on No. 5.

Another plaintiff, N. J. Lindesmith, was examined on practically all the phases of the case made by the pleadings. He described the 2-inch line as being above the ground in No. 8, and as having been there for a long

time, and was there when he moved there. He stated that he went down to Mr. Sturm's well and told an old gentleman, there present in court, that he did not want to know anything from him except the line that he was using gas out of, and he showed him. The west end of the line went to Morris, and the big line went somewhere else. From that he went to the measurements and the offsets.

J. E. Powell was introduced, but his testimony went largely to the management. J. H. York was introduced and testified about some of the wells being muddied up. J. W. Harding testified that he was pumping the Sturm lease north of the Lindesmith lease. That the gas was off at his place about the time of the trouble between the Gypsy Oil Company and the owner of the fee, it going off between sundown and dark. He did not know where the gas came from, however, that he was using. T. S. Davidson was introduced as to measurements. He said that he ran the pipe for a little distance from the well, and saw the line, but did not know what was in it. D. N. Swindell testified about the oil produced on the Sturm lease and its going down.

Hugh L. Sturm was called on behalf of the plaintiff, and he testified about the wells that he had on his lease, but appears not to have been asked about gas and where he got it. M. M. Davis was introduced with reference to well No. 5 and how he pumped, and about the necessity for cleaning it out and about how long they pumped it after it went on to water.

Victor Clark, the son of plaintiff, detailed the talk between Mr. Shaw and his father about the well being open, one claiming it was, and the other it was not, and his father telling Shaw not to move the pipe line at the well, and that sometime afterwards he saw them breaking out the pipe there, but Shaw was not there, and that the man said the Gypsy Oil Company had them to do it. He said he ran the 2-inch pipe line to where it forked, and one was going northwest and the other northeast and there was gas in it. That it was about the first of January.

J. A. Dunn testified as to the talk with Shaw and said Shaw claimed the line was closed and was a dead line, and that they walked over it and there was gas leaking out and they walked to the fork. He did not follow the main line northwest towards the Gypsy camp. D. V. Catterlin was called by the plaintiffs to produce the records of the Gypsy Oil Company showing the production on No. 5 Lindesmith, and the production sheet was marked as exhibit 42, showing the production from July, 1924, to the present

time. Objection was made to it because it was not applicable to No. 5.

At page 251 of the record, the court ruled that if they had any testimony as to the general average of the wells, it would be all right, and Mr. Billings, for the defendant, stated that Mr. Davis, as he thought, had such records as the Gypsy had on the production, and the following occurred:

"By the Court: Take him out and talk to him. No use of going in here on a fishing expedition. By a juror: No, he might not bite. By Mr. Pardue (of counsel for plaintiffs): We rest, if the court please."

This was followed by a demurrer to the evidence, which was overruled, and the defendant put on its testimony, which showed the settlement and the offsets and the cost of certain wells on the adjoining property and what it was producing, the water hazards, using Mr. Sturm as a witness. E. D. Johnson was introduced and testified upon the same line and what was an offset, and so did Mr. A. M. Helper. Mr. H. C. Davis was interrogated with reference to well No. 5. P. E. Disel, who had pumped on the lease, was interrogated with reference to No. 5, and told of pumping the water. J. S. Armour was interrogated upon the same line. J. W. Anderson, former superintendent, was interrogated with reference to No. 6, showing that it was practically dead in December, 1925, and told about a dry hole that they plugged. D. V. Catterlin was recalled and testified concerning the payment of the gas royalties on well No. 8, as shown by the company's records. Payments began in May, 1925, and Mr. Clark's part for 1925 was $247.30, making an average of $25 a month. The royalty paid in 1926 was $260.22, a little over $30 a month, and the royalty paid in January 21, 1927, up to date of filing the suit, was $115.97, making a monthly average of $38. The 1926 payment represented the amount used by the Lone Star Gas Company and for gas sold another Gypsy lease. In the month of September, 1926. Mr. Clark got $16.20 royalty from this source. It developed that the connection to another lease was not metered, but was figured on the horsepower of the engine and the length of time it ran. He testified about No. 6 also.

Mr. W. J. Anderson was called with reference to No. 5 and No. 6, and he testified about the Bradenhead that was on well No. 8, and about the way the lines were laid, and how they were laid, and about the gas that came from the Bradenhead No. 8, and came from the open flow of No. 8, and about its being conducted to the meter house of the Lone Star, and as to some of the various wells on the place, and about

the various valves and the use of them on the lease, and about the gate leaking on the Morris, and the use of gas from No. 8 during the summer and early fall of 1926, and during the time it was shut off, and about getting gas out of No. 8 Bradenhead.

The bill for the gas was shown, and he testified that the gas from Bradenhead No. 8 was not put through a meter, because the pressure was not sufficient at the time, and about the gas being used on the lease for power from this Bradenhead, and about the talk with Mr. Clark, and his sending Mr. Shaw over to look after it. He was cross-examined, and it developed that during the 15 days they used the Bradenhead gas off of the lease, it had made 6,877,000 cubic feet. The main well for 1925 produced 18,000,000 feet, and the next year 165,136,000 feet, and the next year 55,673,000 feet. The variation in the pressure in the Bradenhead was gone into, and it was claimed that about 10 days after the complaint about the valve on the Bradenhead was made the connection was taken out.

Mr. Shaw was called, and detailed about how the gas had been used for running the machinery, and the various lines on the place, and about some of the gas pressure from the Morris being sent into No. 8 for the purpose of loosening it up, and being kept on for a few hours and then turned off. Also, about the regulator and the various changes in the lines, and a valve was used to indicate the kind of valve that was connected with the Bradenhead, and also about the sticking of the valves when they were shut completely down, and about the conversation with Mr. Clark about the gate valve. He was cross-examined as to the rock pressure and the variations in pressure of the Bradenhead, and about the high pressure valve being used, and about the pressure that came from the other well.

Mr. Anderson was recalled to tell about the Lone Star Gas Company handling the gas. Mr. Pressley was called and told the reason for laying the lines, and when some of them were laid. Some were laid to get circulation in No. 7 to loosen the casing, apparently by high pressure gas. The checks that were used in the settlement of the suit were introduced, and the defendant rested, and Mr. Clark, one of the plaintiffs, was called in rebuttal, and in rebuttal he claimed that the line was taken out before he got out there with Mr. Pardue and the Commissioner, Mr. Pardue being his attorney, and at page 343, Mr. Stigler asked him:

"Q. The second day after you were up there the second time? A. Yes, sir."

On cross-examination he stated that it was right after the first of the year, January, 1927. With that the plaintiff rested, and the Gypsy Oil Company asked for an instructed verdict, basing part of it on the lease being valid and enforceable. The court says:

"By the Court: I will tell you what I will do. I will submit one question of facts to the jury, and that is on the question of stealing gas."

Thereupon the Gypsy Oil Company asked for an instructed verdict on paragraphs 3, 4, 5, and 6 of the final pleadings, and also for a directed verdict as to No. 8, and the court said:

"By the Court: I am going to sustain the demurrer as to all the paragraphs except No. 8, and overrule it as to it. By Mr. Billings (of counsel for plaintiffs): We except to the action of the court in sustaining the demurrer to the evidence to all matters in the petition except paragraph No. 8. By the Court: All right."

The record is silent as to whether these remarks of the court took place in the presence of the jury, but there seems to be nothing to the contrary. The court instructed the jury and defined the issues to the jury as follows:

"Gentlemen of the jury, the contention of the plaintiffs is simply this: On and after July 24, 1924, the plaintiffs were the owners of 56/160 interest in the oil and gas royalties on the land described in their petition, and which is in question in this lawsuit, and upon which land the Gypsy Oil Company owned and operated an oil and gas mining lease. The contention of the plaintiffs further is this: That well No. 8 had been developed as a gas well; that the Gypsy Oil Company has taken certain gas and has misappropriated same to their own use and benefit and to the detriment and hurt of the plaintiffs and the plaintiffs allege that the amount of gas taken from well No. 8 and so misappropriated amounts to the sum of $25,000, and they therefore sue for $25,000 and the cost of this action.

"The defendant, Gypsy Oil Company, answers the plaintiffs' petition upon that count and denies generally and specifically that it misappropriated any gas to the use and benefit of the Gypsy Oil Company and to the hurt and detriment of the plaintiffs in this case. The defendant further says that all gas that was taken from well No. 8 was paid for by the defendant, Gypsy Oil Company, and therefore they owe the plaintiffs nothing whatsoever, and they ask that they go hence without cost in this case, or that they recover judgment for their cost.

"That is the only issue for you to try in the case. The court has withdrawn from your consideration all other issues in this

case and submits only the issue heretofore briefly outlined to you.

"To which defendants except and exceptions allowed.
"Asa E. Walden, Judge."

The second instruction is as follows:

"The burden in this case is placed upon the plaintiffs to show the Gypsy Oil Company misappropriated any gas belonging to the plaintiffs, they must prove that by a fair preponderance of the testimony, and as to every allegation in count 8, which the court is submitting to you, that is, that the Gypsy Oil Company misappropriated the gas, that it has not paid for it, and also to show the amount thereof and its value. This must be proven by a fair preponderance of the testimony, and you are instructed that the term 'fair preponderance' of the testimony means such testimony as is most convincing to your minds as reasonable men, and is not measured by the greater number of witnesses testifying upon the one side or the other.

"To which defendants except and exceptions allowed.
"Asa E. Walden, Judge."

The third instruction is as follows:

"Therefore, you are instructed if you believe from all of the facts and circumstances in this case that the Gypsy Oil Company misappropriated gas belonging to these plaintiffs, then you are instructed that the Gypsy Oil Company should be held to pay for said gas and your verdict should be for the plaintiffs. You are instructed that if you find from a preponderance of the testimony that the plaintiff is entitled to recover on account of the Gypsy Oil Company having misappropriated gas from well No. 8, it will be your duty to fix the amount of plaintiff's recovery, and in this connection you are told that from the very nature of the circumstances surrounding the alleged misappropriation of gas, that it is difficult to determine the exact amount of the gas so misappropriated, if any. The law therefore permits you to take into consideration all of the facts and circumstances surrounding said alleged misappropriation of gas, the probable amount of the production of the well, and the probable amount that you find from all of the testimony was appropriated and then return such verdict as will reasonably compensate the plaintiffs for any loss sustained by the wrong or neglect of the defendant, the Gypsy Oil Company, which are not clearly ascertainable. In other words, you would not be permitted to go into the field of conjecture, but the verdict rendered must reflect the deliberate judgment of the jurors concurring therein and must also reflect the fair amount of the compensation the plaintiffs are entitled to, if any, and no more. However, you are told that you could render no greater verdict than that sued for, to wit: $25,000. On the other hand, if you do not find by a fair preponderance of the testimony that the Gypsy Oil Company misappropriated the gas belonging to these plaintiffs, then it would be your duty under your oaths as jurors to return a verdict for the defendant in this case.

"To which defendants except and exceptions allowed.
"Asa E. Walden, Judge."

Besides these, there were some general instructions on the subject of being judges of the facts, and not allowing prejudice to control the verdict. A verdict was given for the plaintiffs for $3,500 against the Gypsy Oil Company. Complaint is made of this verdict, and motion for new trial was filed on account of its not being warranted by the evidence, and showing passion and prejudice, and also the refusal to peremptorily instruct, errors of the court in giving instructions, and the amount of the recovery being too great. This was overruled, followed by exceptions, and the case being brought here.

A lengthy brief has been filed on behalf of plaintiff in error, and a counter brief has been filed on behalf of defendants in error. Complaint is made in the brief of plaintiff in error of the action of the court in refusing a new trial, and that the jury rendered a verdict unwarranted by the evidence, and of the court's instructions to the jury, and defining the issues.

The answer brief of the defendants in error undertakes to set out the evidence relied upon, and a statement is made as to the facts, and justification for the charge of the court, and the position is taken that they were suing for a conversion of gas, arising from the Gypsy Oil Company continuing for three years to take gas out of the first sand without measuring it, and without accounting for it to the royalty owners, and the pleadings on the point are set out at page 4. Clearly, that pleading shows that the action was for an accounting for the price of the gas that was either used by the Gypsy Oil Company off the leases or sold. The testimony relied on as a foundation for a recovery on this point is that of the witness Clark, and his conversation with Harry Shaw, and also the fact that Mr. Sturm had no gas the next morning, and the further fact that the line had been there for several years, and the fact that they were out of gas at Pruitt City after the valve was closed, and also the variation in the pay checks for the gas. Also, the testimony of Lindesmith, who had lived on the lease for years, and the fact that there was gas in the line is relied upon, and the testimony of Harding about the gas going off. Reference is also had to the amount of gas

for the year prior to March 31, 1927, being $5,567.30, and afterwards being $9,564.10, and the increase in the Clark checks.

An examination has been had of this entire record, and also of the charge of the court, and the defining by the court of the issues, and the remarks of the court concerning the case. The verdict of the jury in this case allows $3,500 as unaccounted for royalty that the plaintiffs Lindesmith and Clark are entitled to recover by reason of the gas coming out of well No. 8 through the Bradenhead.

There is nothing in this record to indicate that the Gypsy Oil Company in any way failed to properly keep record of the gas produced and sold or used off of the lease. It used gas from the Bradenhead in drilling and other operations on the lease. The verdict of the jury would necessarily make the amount of gas derived from this one well and sold amount to not only the amount that the records show, but in the neighborhood of $80,000 more. The evidence in this case, tending to show that the Gypsy Oil Company had allowed a waste of gas, or a misappropriation, can be summarized in large measure as being based on the testimony of plaintiff Clark, with reference to the condition of the gate valve. He justified his conclusion on the gate valve being open on one occasion by the bright side of it showing. Just what significance that would carry in all aspects of the case, we are not advised, but the inference is that it was bright as not having been exposed to the elements. Every time that the men in charge were asked about this, immediately they asserted that the valve was closed. In one case the witness Clark said he took witnesses along to prove that he did not turn the valve. Everyone knows that on a lease of this kind, where the adjoining leases do not have gas, there is a common practice to accommodate neighbors, and to dispose of the gas for drilling purposes. Here such use was permitted and contemplated, according to the record. This record shows most clearly that the purpose of laying the various lines and making the various connections was to make the best use of the gas and to operate the property.

The entire case of misappropriation here rests upon the proposition of the gate valve being found open once. As to who opened that valve, the evidence is silent. The men in charge say that it was closed. Evidently it was a recent opening, if Clark's statement of the matter is correct. Anybody, however, could have opened the valve.

There were two lawsuits in this case. The first one had been settled, and the settlement papers are introduced into this record. From the original charges, it appears that the Gypsy Oil Company were rather liberal with the plaintiffs, and settled the case without trial, by getting a new lease upon the property, and by getting a stipulation that would shut off future contentions as to the actual development on the premises and the use of offsets. This was attacked in this case as being unilateral, and a great many other things were urged in the pleadings on a very extravagant order, in fact $115,000 was asked as damages in this case, and a good deal of testimony was introduced on a great many matters that the court later struck out as not belonging here.

The record shows that the other parties, owning practically a two-thirds interest, refused to join in the litigation, and a part of them actually filed a demurrer in this case when they were made defendants, but just what became of that demurrer is either not in the case-made or has escaped our attention after examining it. We do not think the verdict in this case on the phase of liability was warranted by the evidence. The records of the oil company were introduced showing the production, and appear regular. The testimony of Mr. Sturm, who has an oil well on the adjoining property, is here. The evidence as to where he got his gas from could have been readily asked about by the plaintiffs, as they used him for their witness, and the plaintiffs relied merely upon statements as to the gas going off at the Sturm place, made evidently by Mr. Harding, who was used by the plaintiffs at page 216, and to whom suggestions were made in the course of the examination about the gas being off, and who stated that the gas went off between sundown and dark, and stated that he did not know where the gas came from.

When one examines the testimony of the plaintiff Lindesmith, and his caution in asking this man only as to what line he got his gas out of, and the failure to ask Mr. Sturm anything about it, it strongly indicates that all of the facts bearing on the matter were not brought out. An examination of the court's attitude in the matter in referring to the proposition as "stealing," when it was just a plain accounting, and all the evidence showing any failure to account was based on a valve being open once, that could have been opened by anyone, whether interested or not, coupled with the extravagance of the charges, is strongly indicative of the fact that defendant did not have a fair and impartial trial. It seems to us that the charge of the court strongly indi-

cated to the jury what the sympathies of the judge were.

The circumstances relied upon as a foundation for the position that the defendant company had failed to account for gas were not very strong. The plaintiffs, though extravagant in their demands and their deductions, were merely asking for an accounting. A settlement had been had in the former suit, but the demands in the former suit were small as compared with the demands in this. The lease had been in operation since 1917. Why the court should use, in addressing the attorneys in the case, whether the jury was there or not, the proposition about "stealing" gas, is hard to determine, and why the court should charge the jury on the theory of a misappropriation, as compared to that of an accounting, and especially on such evidence as was here, we are somewhat at a loss to reason out. Evidently the court misconstrued what he had before him for trial, and evidently the court misconstrued the ordinary rule of establishing facts from circumstances, and evidently the court overlooked the fact that under the state system the court should refrain from using language that would indicate to the jury his inclinations either way.

The charge has been set out above, and it needs no argument to show that as applied to this case it is erroneous. The evidence and admitted facts in the case show most clearly that the verdict in the case was not sustained by sufficient evidence as to the liability, much less as to the amount thereof.

A great many authorities are cited. especially by the plaintiff in error, upon the proposition of what other courts have done, and precedent, but, in this case, we do not think citation of authority would be necessary, as the case turns largely on the examination of the evidence in the particular case, and also upon the pleadings in the case, and the applications made by the court in the trial of the case. We do not think the jury was properly instructed, or that the plaintiff in error has had a fair trial.

The cause is reversed, with directions to grant a new trial.

LESTER, C. J., and RILEY, CULLISON. SWINDALL, and McNEILL. JJ., concur. HEFNER, and ANDREWS, JJ., absent. CLARK, V. C. J., dissents.