J. F. DURKEE et al., Plaintiffs in Error,

v.

Alfred HAZAN et al., Defendants in Error.

No. 40673.

Supreme Court of Oklahoma.

June 25, 1968.

Rehearing Denied April 22, 1969.

Young, Young & Young, by David Young, Sapulpa, for plaintiffs in error.

Boatman, Pugsley & Boatman, Okmulgee, John T. Gibson, Tulsa, Jack B. Sellers, Joe Moore, Sapulpa, Charles A. Whitebook, Tulsa, for defendants in error.

BERRY, Justice.

This appeal presents a third phase of variant litigation involving rights and interests in the NW/4 of Sec. 20, Twp. 15N, R. 13E, Okmulgee County, Oklahoma. See Supreme Court No. 39,738, Henry et al. v. Barnett, Judge, etc. application for writ of mandamus denied without opinion, July 18, 1961. Henry et al. v. Ionic Pet. Co., Inc., Okl., 391 P.2d 792, affirming judgment granting injunction against landowners, plaintiffs in this case, for interference with right of ingress and egress to producing oil leases here involved.

Appeal is by original record composed of partial record of 2248 pages of transcribed testimony and a multitude of exhibits. The extent of such record precludes either narrative summation or general discussion of the overall evidence. The court notes, however, detailed examination of the entire record. Gleaned from such examination, the matters hereafter recited disclose the origin and basis of the action, and the evidentiary foundation of the trial court's adjudication of the dispositive issues.

The appeal attacks the correctness of the trial court's judgment denying plaintiffs' prayer to quiet plaintiffs' fee title, individual mineral interests in the East Half of the described tract, and cancel various oil and gas leases executed thereon by certain interest holders during 1954–1955 and later assignments of fractional interests, because of alleged abandonment, and for other relief.

Plaintiffs in error, Roy Henry et ux., hereafter plaintiffs, alleged ownership and possession of property under warranty deed executed November 5, 1956, by Ed Wright et ux., conveying surface and undivided %4sths mineral interest to Henrys in joint tenancy. Plaintiffs King, individually and as administratrix of J. W. King, deceased, J. F. Durkee, Fay Lonyay and M. J. King had acquired their undivided mineral interests by earlier conveyance.

Defendants in error, herein called defendants, Illini Oil Co., Inc., Edwards, Sel-

lers, Ionic Pet. Co. et. al., derived rights in the property under oil and gas leases executed by individual plaintiffs, or the Wrights, in 1954–1955. Other individual defendants were investors in the original promotional endeavors of Illini Oil Co., Inc. Others (Mizel and the Bank) were defendants because of claims arising out of foreclosure proceedings against the leasehold estate, or by assignment of mortgage executed by defendant investors covering fractional, undivided shares of the working interest previously acquired from Illini.

Defendants Gibson and P. I. C. Management Co., Inc. own undivided mineral interests as grantees of W. G. Phillips et ux. in the entire quarter section. Part of this controversy is between Henrys and Gibson concerning claimed subrogation rights resulting from Henrys' payment of a prior mortgage covering the entire tract, which included Gibson's mineral interest. This asserted right resulted from plaintiffs reliance upon the Wrights' warranty deed to their entire interest, including the interest conveyed to Gibson prior to warranty deed, but subsequent to execution of the mortgage to a Tulsa bank.

The petition alleged plaintiffs, and defendants M. J. King, Gibson and P. I. C. Management Co., were owners in possession of this property in the following proportions:

"Surface and undivided %8ths of minerals—Roy M. Henry and Lana Henry

Undivided %8ths of minerals—J. F. Durkee

Undivided ¾8ths of minerals—Minnie King, as surviving wife and heir of J. W. King, deceased

Undivided ¾8ths of minerals—Fay Lamayay

Undivided 1¾8ths of minerals—M. J. King

Undivided 1¾8ths of minerals—P. I. C. Management Co., Inc.

Undivided %8ths of minerals—John T. Gibson"

The cause of action originated in the acquisition, development and subsequent operations of oil and gas leases in the described quarter section, principally by the defendant Illini Oil Co., Inc. This corporation was organized late in 1954 by Robert Booth, James Lee, C. M. Harding and with Paul C. Edwards as chairman of the board. Apparently the interests of Booth and Lee in the corporation were terminated in 1958 when purchased by the corporation. The initiating parties in the activities involved in this action were C. M. Pierce, a lease broker, C. M. Harding, an experienced oil operator, and Edwards, a promoter, who previously had engaged in an oil lease partnership operation with Pierce and the Edcliff Oil Company. In 1954 Pierce was making inquiry as to possibility of a prospective drilling promotion. His attorney, defendant Gibson, had knowledge of some prior operations in the area, and recommended this property as a likely location, and with hope of getting a well drilled.

On May 15, 1954, Pierce secured a lease from the Wrights covering the entire quarter section, for a primary term of one year or so long as production was obtained by the lessee. This lease also contained an agreement for a well to be commenced on the NW quarter on or before October 1, 1954. After acquisition of the initial lease Pierce also secured leases from all parties holding any interest in the NW/4 except the interest of plaintiff Lonyay acquisition of which will be considered hereafter.

On December 20, 1954, Pierce assigned these leases to Edwards, who then transferred same to Illini. The corporate defendant thereafter assigned numerous fractional shares of the ⅞ths working interest to generally non-resident individuals, described during trial as the "Springfield Investors", named as defendants herein. Unquestionably this was part of Edwards' overall promotion. The Illini operations eventually resulted in acquisition of approximately 23 leases, upon which some 70 wells were drilled, the majority of which were producing wells.

The first well drilled, and which provides the basic controversy in this case, was the Gibson 1A. The well location was surveyed by a local geologist already familiar with the area, who mapped the location of known, old wells on the NW/4, for Illini. The geologist (Logan), according to his map made in April 1955, staked a location for the proposed well. After drilling commenced, in July 1955, Logan returned to the well and observed the drilling operation was northeast of his original location. However, the witness was of the opinion the well was upon the tract where located originally. Eventually it was determined the Gibson 1A had been drilled upon the E/2 NW/4. After completion as a producing well production was piped to a tank battery located in W/2 of the quarter section.

The basic controversy evolved from the fact J. W. King, who died prior to trial, owned an undivided ⅟₁₆th interest in the E/2 NW/4. On February 12, 1954, King and wife, intervening plaintiff and administratrix of her decedent, joined in execution of an oil and gas lease to Pierce covering their interest. This lease provided an 18 month primary term, or as long thereafter as oil or gas was produced and, the lessees further covenant:

"1. To deliver to the credit of the lessor, free of costs, in the pipeline to which the lessee may connect wells on said land, the equal one-eighth part of all oil produced and saved from the leased premises.

\*      \*      \*      \*      \*      \*

"Drilling operations to commence on or before August 1, 1955, at a location to be determined on the said NW¼ of Sec. 20, Twp. 15N, Range 13E, Okmulgee Co. Okla.

Otherwise this lease shall become null and void."

The controversy arises because this lease, drafted in longhand by Pierce, discloses erasure and overwriting in the ultimate date, August 1, 1955, for commencement of drilling operations. Plaintiff intervenor

alleged execution of the lease requiring drilling operations to commence *October 1, 1954,* which lease expired by its own terms for failure to drill; that in July 1955 Illini entered upon Kings' property and drilled a well and thereafter set up tanks and "fraudulently converted, transported and sold large amounts" of Kings' oil. Further, on February 9, 1959, defendants forged, altered and changed the date on such lease and caused same to be filed of record with criminal intent to defraud, fraudulent alteration having been concealed from deceased's heirs, and defendant Illini, agent for other defendants, caused a purported assignment of such forged instrument, dated March 3, 1954, to be made.

The matters summarized were the basis for the asserted cloud upon intervenor's title, as supporting the prayer for cancellation of all instruments of record, and decree quieting title against defendants and those claiming by or through any defendants. Because substantial portions of the argument are premised upon the claim of forgery and alteration, and resultant failure of any title based thereon, this matter will be considered separately hereafter. In interest of brevity and clarity transactions with other interest owners, asserted as the basis of arguments urged on appeal, also will be considered separately.

The petition, as amended, was directed against all parties subsequently interested in the two tracts (NW/4 Sec. 20–15–13) leased to Pierce and then assigned to defendant Illini, which subsequently conveyed fractional interests to defendants Gibson, P. I. C. Management Company and Mike King, a named defendant. Plaintiffs Henry alleged joint tenancy ownership and possession of E/2 NW/4 and undivided ⁵⁄₂₄ths mineral interest by and through Wright and wife who warranted title; acting as Wrights' attorney defendant Gibson induced plaintiffs to pay mortgage indebtedness on the entire property which included agent's mineral interest, hence attorney thus was estopped to assert his interest contrary to warranty deed. Lease

to Pierce required drilling well prior to October 1, 1954, on NW/4 and no well having been commenced the lease terminated and warranty deed was free and clear of lease and constituted cloud on plaintiffs' title which should be canceled. Allegations concerning the Durkees' interest asserted right to cancellation of leases because of material alteration, violation of lease for failure to pay rentals before November 19, 1955, or to run oil to lessor's credit, and for fraudulent conversion of oil from May 1955 until 1959.

Cancellation of the Lonyay lease was sought on grounds defendants drilled a well and removed large amounts of oil prior to execution of lease, and continuously converted oil from May 1955 until January 1961; Lonyay lease was obtained by fraudulent misrepresentation and withholding true facts from plaintiff and thus was null and void; after obtaining lease defendants continued to convert oil while wrongfully withholding lease from record until 1959.

The petition charged defendants moved onto the property in June 1955 and drilled a well which was produced until June 1956, then shut down and not produced for over six months and thus abandoned. If any leases were in effect in 1956, which plaintiffs denied, same expired and terminated prior to February 1957; after this date defendants moved onto this property and commenced producing without leases or muniments of title, until again abandoned in January 1961 thereby caused great and irreparable damage by allowing salt water pollution of oil stratas. Further, defendants had been notified of damage and that lease was to be treated as abandoned unless production was resumed within in 30 days from date of notice; abandonment resulted from failure to produce for over 90 days, by reason of which plaintiffs were entitled to cancellation of all purported leases, and to have title quieted against defendants, or any persons claiming under defendants.

Admitting ownership of specified interests in the leasehold, defendants answer in respect to their separate interests controverted the claims asserted in the petition.

Defendants Edwards admitted ownership of an interest in the leasehold, denied allegations of both plaintiffs and intervenor relative to expiration or abandonment, and alleged lease remained in force and defendants Ionic Petroleum Company and Sellers were producing and marketing oil from which plaintiffs were receiving proportionate shares. Intervenor's claim of forgery of leases in the claim of title was denied specifically.

Defendant Gibson answered alleging acquisition of interest from Wright and wife under two separate deeds, one dated February 24, 1951, the other dated December 23, 1953, and recorded January 19, 1954, by virtue of which he owned undivided %8ths mineral interest. Defendant also denied allegations concerning his attorney and agency relationship with the Wrights at the time of Henrys' acquisition of property; that deeds under which defendant claimed were of record and reflected by title examination prior to plaintiffs' purchase and defendant asked that his own title be quieted. Corporate defendant P.I. C. Management Co., Inc., denied allegations of plaintiff and asked that title and ownership of undivided fourth mineral interest under real estate involved be quieted.

By reason of the peculiar status of M. J. King, whose original position as party defendant changed during the trial, the pleadings and relevant evidence are summarized separately. This party answered, October 24, 1961, originally admitting ownership of undivided 1%8ths mineral interest in the property, specifically pleading recognition of the leases described in the petition to be valid and subsisting, asserted his right to the proportionate share of production as against plaintiffs' claims and asked judgment confirming his ownership. The answer was filed over signatures of Gibson, joined by local Okmulgee counsel representing other defendants, on October 24, 1961, after Gibson had been employed

by King "to protect his royalty interest" in the E/2 NW/4.

Although King's deposition was taken prior to trial, no controversy had been raised as to his interest. More than a month after the trial began plaintiffs' counsel sought and obtained leave to withdraw the answer and filed amended answer and cross-petition. This was done although King had not discharged Gibson nor paid a fee for services, and had not been advised by new counsel of necessity for settlement with one attorney before employment of new counsel. King admittedly knew such actions placed him in diametrically opposed positions. However, the trial court granted Gibson leave to withdraw as counsel of record.

Thereafter amended answer and cross-petition were filed, wherein defendant alleged ownership of undivided $1\frac{2}{48}$ths interest free and clear of any valid lease; adopted the intervention petition denying ratification or confirmation of validity of any lease with knowledge of material facts, but that material facts had been concealed by claimed lessees and oil purchasers, which had been obtained by fraud and concealment and were void. Such cross-petition realleged facts relative to execution and eventual assignment of rights under original lease to Pierce and subsequent transactions whereunder all other defendants eventually acquired interests; alleged all assignments void and leases had terminated for failure to comply with express terms; prayed cancellation of all leases for reasons asserted in plaintiffs' petition.

Other pleadings, and amended pleadings, were filed which did not change the issues presented to the trial court in a trial which began December 17, 1962, and was not concluded until June 24, 1963. Much of the foregoing is made necessary only by reason of the contentions and arguments urged on appeal. By way of recapitulation we call attention again to matters which gave rise to this controversy, and which are closely related to facts just reviewed.

After acquisition of leases by Pierce in 1954 these interests were transferred and became property of Illini Oil Co., Inc. Development began on the property involved and the company apparently continued profitable operations until Harding's sudden death in September 1957. Thereafter Illini's financial position declined, Federal tax liens ($60,000.00) were filed and the company's bank account frozen, creditors began foreclosure proceedings, and eventually operation of the leases was shut down on August 16, 1960.

Thereafter Edwards negotiated an arrangement with defendant Sellers and Illini's assets were assigned to Sellers and others. The name of the operating company was changed to Ionic, etc. and Sellers then pumped the lease (4 wells) during January—February 1961, to determine potential. Oil runs during this period were paid to most interest holders under executed division orders. By June 1961 Sellers had completed necessary arrangements to begin producing leases. Employees who attempted to go upon the leases, by the only available road across the Henrys' land, were kept out by these plaintiffs. As a result it became necessary to seek injunction against these plaintiffs, which injunction was made permanent in Henry v. Ionic Pet. Co., supra.

After conclusion of plaintiffs' case the trial court sustained defendant Gibson's demurrer to the evidence of plaintiffs and intervenor. Trial was concluded April 19, 1963, after which the cause was submitted upon briefs and oral argument. After having the matter under advisement the trial court entered judgment decreeing: (1) ownership of E/2 NW/4 was vested in parties named in petition; (2) leases covering such tract were not subject to cancellation upon any ground alleged by plaintiffs or intervenor; (3) there had been 542.76 barrels of oil produced which unintentionally had not been accounted for by the operator, out of which plaintiffs were entitled to their proportionate royalty interests; (4) accounting therefor should be

based upon highest per barrel price between completion date of first well and filing of this action; (5) the Wrights did not own ¾₄₈ths mineral interest conveyed by warranty deed to plaintiffs' Henry and breached warranty in this respect, and Wrights were given notice and did defend warranty; (6) further hearing should be held to ascertain value of ¾₄₈ths mineral interest. This appeal attacks the validity and propriety of the judgment rendered.

■ Undue prolixity of the contentions presented and repetitious arguments urged relative to certain of these matters contraindicate need for separate consideration. For such reason extraneous arguments are not discussed. Other phases or grounds of argument are predicated upon the interpretation or meaning plaintiffs seek to place upon particular portions of the evidence. This is an equity case in which this court examines the record and weighs the evidence solely to ascertain whether the trial court's judgment is against the clear weight thereof. Morris v. Leverett, Okl., 434 P.2d 912.

The asserted legal basis of separate contentions properly may be combined for disposition in the interest of brevity. As a subdivision of three contentions involving the separate leases of J. W. King, Lonyay, Durkee and M. J. King, plaintiffs argue each was null and void and subject to cancellation both for failure to pay delay rentals and for violation of express provisions requiring oil to be run to the credit of the lessor in compliance with lease requirements.

Matters surrounding execution of the J. W. King lease are mentioned above. The complaint is this lease originally provided for termination October 1, 1954, for failure to drill; that same was materially altered by changing the termination date to August 1, 1955; such change without argeement of the parties was a forgery which rendered the lease void and required cancellation. The lease in question was the subject of examination and testimony by a highly qualified examiner of questioned documents, who testified as an expert.

■ The lease was purchased by Pierce, who drafted an instrument in longhand on the last lease form available, and testified a mistake was made which was obviously erased and the correct date—August 1, 1955—inserted. The notary (O'Dell), who accompanied Pierce was called into the King home to take the acknowledgment, testified the lease was the same instrument which he had notarized, and was in the same condition at the time notarized. The expert testimony was sufficient to establish the erasure and overwriting occurred at the time of execution of the lease rather than by subsequent forged alteration. The trial court's general judgment was a finding against this claim.

The contention that this lease automatically terminated October 1, 1954, because no well was commenced on the NW/4 prior to such date is without merit, as are collateral arguments premised upon the asserted voidness of the lease. The evidence showed commencement of drilling operations on Gibson 1A in April 1955. The trial court correctly refused to cancel the lease in question.

A separate contention is urged relative to asserted error of the trial court in refusing to cancel the Lonyay (Lamayay) lease. The claim is that Pierce was guilty of fraud and overreaching in procuring the lease without revealing a well already had been drilled; oil was run from the lease without paying rentals or making runs to the lessor's credit; and fraud, bad faith and inequitable conduct were disclosed in several particulars. The principal argument is that the lease was obtained by concealment of material facts despite an affirmative duty to disclose and make accounting, since the well began producing in May 1955 before Lonyay's execution of the lease on July 11, 1955.

This plaintiff's interest was derived from her previous husband's ownership. On July 7, 1955, the attorney Gibson wrote plaintiff, whose married name erroneously

had been stated as Lamayay. The letter advised some royalty owners voluntarily had given leases but that $10.00 per acre had been paid for 5 year leases, and a $50.00 draft was tendered if plaintiff cared to lease on those terms. The lessor executed the lease as Fay Lamayay and cashed the draft. The evidence disclosed plaintiff, who was in ill health, moved from Glendale to Oceanside, California, in September 1955, suffered a stroke in 1956 and was taken to the county hospital in San Diego for six months, then to a nursing home; and in 1957 was removed to a rest home in El Cajon for a year and thereafter returned to a home for ambulatory patients in San Diego. It was during this period that one of the attorneys for plaintiffs went to California, called upon plaintiff and was employed to represent her interests. This occurred prior to inquiry being directed to the crude oil purchasing company (Mohawk) as to whether proceeds of oil runs were being held for her benefit.

Eventually plaintiff was found in Amarillo, Texas, in 1962, and thereafter returned to Henryetta, Oklahoma, in August 1963. While in Amarillo a division order form was sent plaintiff for execution which was executed and returned. Much is sought to be made of the fact that because Gibson communicated with plaintiff, relative to execution of the division orders, this attorney was attempting to deal separately with counsel's client. In view of the record evidence surrounding the transactions with plaintiff Lonyay this argument does not merit further discussion.

As in the case with other interest holders, plaintiffs claim the lease required cancellation because no rentals were paid or oil runs credited between May 1955 and 1959, and that bad faith was evidenced because the lease on the E/2 NW/4 was not recorded for approximately 3½ years. Because this argument also is the basis of contentions advanced against other leases, we review some of the evidence bearing upon these phases to ascertain whether the trial court's general finding was against the clear weight of the evidence. In weighing the evidence respecting these matters certain matters should be borne in mind: (1) the well mistakenly was drilled on the E/2 of the quarter through error; (2) this was not established positively until 1958; (3) production was trucked to and purchased by different purchasers and credit for oil runs mistakenly was paid to those interest holders in the W/2 NW/4 who executed division orders; (4) upon discovering the well was drilled on the wrong location recomputation was made of oil purchased by the initial purchaser (Helms & Beckham), and efforts made to recover royalties paid to interest holders in the W/2, because of the mistaken belief the well was located on that part of the tract.

Plaintiffs' witness (Logan) testified he surveyed the property and staked a location on the W/2, where Illini intended the well be drilled. The tract was in very rough, hilly terrain, and eventually it was discovered the well had been drilled approximately 85 feet over onto the E/2. After being retained as counsel for Illini, an attorney (Whitebook) began preparation of a drilling opinion, and discovered the initial oil purchaser (Helms & Beckham) was paying royalties to the interest holders under the W/2. A survey then was made which established location of this well to be on the E/2NW/4. A second survey confirmed this fact, and efforts were initiated immediately to recover royalty payments mistakenly paid, as some owners held less interests in the E/2 than in the W/2. It is to be noted the only royalty owner who failed to return the overpayment upon request was the plaintiffs Henry.

The evidence fairly established the Gibson well mistakenly was drilled on the E/2 NW/4, although as concerns plaintiff Lonyay this fact is of no particular significance. The evidence showed after production commenced oil was purchased by Helms & Beckham, although royalties mistakenly were paid to owners in the W/2. The fact oil runs were not paid to Lonyay

cannot be controlling since the evidence further shows she was not available and could not be found to execute a division order until October 1962, at which time she voluntarily accepted the benefits. Had there been demand for payment made and not recognized subsequent to her execution of the lease and division order a different question would be presented. All possible steps were taken to rectify the mistake after discovery and plaintiff voluntarily accepted the benefits when tendered. The claim for cancellation of the lease upon grounds of fraud, bad faith and inequitable conduct is without substance. Fraud is never presumed and the transaction here considered is fairly susceptible of a construction free from imputation of fraud. Evidentiary matters proffered to show bad faith and inequitable conduct were insufficient to provoke the presumption of fraud. The alleged grounds for cancellation were not shown by clear, cogent and convincing testimony. Western Star Mill Co., etc. v. Burns, Okl., 305 P.2d 564; Waggoner v. Johnston, Okl., 408 P.2d 761.

The asserted error inhering in the court's refusal to cancel the lease covering the interest of J. F. and Maude Durkee is based upon allegations of material alteration and mutilation after execution of certain leases, breach of the lease dated November 19, 1954, fraudulent conversion of oil and breach of express and implied terms thereof. Three leases were executed by the Durkees to Pierce, all covering their interest in E/2 NW/4. The first was executed July 15, 1954, and obviously was altered by striking over of dates and alteration of the clause providing for commencement of a well on the NW/4. The second lease was executed by J. M. Durkee to Pierce on August 14, 1954, covering his interest in E/2 NW/2, and obviously was altered by striking over the specified date for commencement of a well on the E/2 of the quarter section. Prior to death J. M. Durkee conveyed his interest to J. F. Durkee. On November 19, 1954, Durkee et ux. executed another lease covering their interest in the E/2. This instrument was for a 5 year primary term, and also provided for payment of rentals in the event a well was not commenced on or before November 19, 1955.

Essentially the same complaints were directed at the trial court's failure to cancel this lease, including particular complaint the lease was not recorded until March 4, 1959. This, coupled with Edwards' testimony no well was intended to be drilled on this property, and no rentals were paid or oil run to Durkee's credit, provides the basis for plaintiffs' conclusion the lease terminated, should have been released and necessarily should have been cancelled. Whatever considerations impelled execution of the 1955 lease, it was upon the tract where the well mistakenly was drilled and from which royalties mistakenly were being paid to those interested in the W/2. Upon discovering oil was being produced from the E/2 Durkee learned oil was being purchased by Helms & Beckham and after inquiry executed a division order and received payment. Durkee's testimony disclosed his participation in this litigation resulted from plaintiff Henry's advice that oil was being stolen and the wells imprudently operated. And, Durkee employed the attorneys because of Henry's advice that the counsel he had employed could straighten the matter out without much expense by giving these attorneys an interest in the property. Nothing Durkee did respecting these matters was based upon other than hearsay statements by Henry.

The Durkee claim for cancellation of these leases is without merit. If it be conceded the two original leases were materially altered, any right to insist on invalidity was waived by execution of division orders and acceptance of royalties under the 5 year lease. A long recognized rule is to the effect that acquiescence in a lease and acceptance of royalty constitutes waiver of any objection the lessor could have taken regarding alteration and estops the lessor from denying the lessee's title. Because Durkees' conduct clearly

disclosed waiver of objection to the earlier transactions, it is unnecessary to consider related questions of ratification or confirmation of the lessee's acts and conduct by the Durkees. See 31 C.J.S. Estoppel § 59 et seq.; 75 C.J.S. Ratification p. 608; Capps v. Hensley, 23 Okl. 311, 100 P. 515; Baker v. Hammett, 23 Okl. 480, 100 P. 1114; Summers Oil & Gas. (Perm. Ed.) § 134.

The contention urged in behalf of M. J. King for cancellation of the lease executed upon his interest merits little discussion. The same arguments are asserted as grounds therefor as with the other leases. As noted earlier, King first was an answering defendant, but during course of trial withdrew his answer and became a party plaintiff. The evidence showed a complete lack of controversy as to the extent of King's interest. Following execution of the lease King, a retired army officer, moved from place to place in several states. After production commenced efforts to locate him for purpose of executing a division order were unavailing. In 1958 King learned from Edwards the property was producing and thereafter claimed funds held in suspense by Mohawk Petroleum Company, the purchasing company, but knew nothing of what had occurred prior to that time.

After the lease was shut down Gibson was hired to protect his interests. However, King learned from plaintiff Henry that oil had been produced and not accounted for, and for this reason became party plaintiff. All the information King had came from the Henrys. As shown by his testimony, after receiving the suspense payment in 1958, and because of Henrys' advice oil runs were taken (by Helms & Beckham) before Mohawk became the purchaser without being accounted for, King conceived the idea that as party plaintiff he could seek cancellation of his lease and profit further. The ultimate posture assumed in this action charitably may be referred to as having been assumed upon the basis of poor advice.

Counsel's argument that "conversion" of King's oil for four years makes cancellation mandatory is without substance.

A further contention urges error in refusing to cancel the Wright lease, which covered land purchased by plaintiffs Henry, and in refusing to quiet title to an undivided interest. Here again the claim is that because no well was commenced before October 1, 1954, automatic termination resulted. Concerning this argument, it is sufficient to observe the requirements for commencing drilling were matters between the original lessor and the lessee and plaintiffs Henry were not privy to that transaction. Subsequently oil was produced and payments made. The Henrys purchased Wright's ranch, including the tract involved, after the Gibson well had been drilled. Thereafter other producing wells were drilled, and the Gibson well was deepened. Division orders were signed and plaintiffs Henry accepted royalty payments.

■ Plaintiffs offer no authority for their argument that failure to perform under the lease to which they were not privies provides basis for subsequent suit for cancellation. Without further discussion, however, it appears these parties had full knowledge of the circumstances when they purchased their property and voluntarily accepted the benefits of the transaction until February 1961. We consider application of the obligation imposed under 15 O.S.1961, § 75, controlling.

■ A further contention asserts error in refusal to cancel all the leases because of cessation of production in 1956. The argument is that the "Springfield Investors" were advised in September 1956 the Gibson lease was abandoned and that attempts to effect a sale had brought ridiculously low bids, but disposition would be made of the property. The evidence showed this well thereafter was deepened and produced profitably, and was followed by drilling and production of other wells which inured to the royalty owners' benefit including the Henrys. The lessee's right to delay production while deepening

a well without violating covenants of diligent operation is recognized by Merrill Covenants Implied in Oil & Gas Leases (2nd Ed.) § 90. And see footnote cases at p. 225. The contentions just considered appear conflicting in that claim for cancellation, based upon alleged 1956 cessation of production, constitutes tacit admission of the producer's responsibility to produce oil under an outstanding lease upon the property. Additionally, Henrys' attorney advised Illini on November 8, 1960, that apparent shutdown of the premises for the prior 60 days had resulted in expiration of the leases, and that only a reasonable time would be given to resume production or suit for cancellation upon grounds of abandonment would be filed.

■ We recognize the verity of the principles quoted in plaintiffs' brief from Merrill's exhaustive work. We also recognize the rule expressed in § 92 of the same treatise, relative ·to the excuses for halting operations. The uncontroverted evidence established financial difficulties engendered by governmental intervention in Illini's affairs during part of the time production was halted. In 1961 defendant acting through Sellers, pumped and tested the wells, for which production the interest holders were paid. When Ionic took over Illini's interest and attempted to open the field in June 1961 the Henrys barred entrance to the properties and litigation commenced. The litigation provoked by Henrys' assertion of expiration of the lease is a recognized circumstance excusing failure to continue operations. See Ind. O. G. & Dev. Co. v. McCrory, 42 Okl. 136, 140 P. 610.

■ Burden of proof showing failure of reasonable diligence in operation is upon the lessor, and proof of failure must be clear. Gypsy Oil Co. v. Smith, 153 Okl. 183, 5 P.2d 140; Merrill, supra, § 94; Warrell v. Parsons, 133 Okl. 61, 271 P. 155, holding forfeiture for failure to operate and develop depends upon circumstances of the particular case and will be decreed only where forfeiture will effectuate justice. Strange v. Hicks, 78 Okl. 1, 188 P. 347; Cotner v. Warren, Okl., 330 P.2d 217; Townsend et al. v. Creekmore-Rooney Co., Okl., 358 P.2d 1103; Kerr v. Hillenberg, Okl., 373 P.2d 66. Also see Hunter v. Clarkson et ux., Okl., 428 P.2d 210, stating that whether temporary cessation of production is for an *unreasonable time without cause* must be viewed in the light of all the circumstances. We are of the opinion the trial court's refusal to cancel the leases under the circumstances shown is not clearly against the weight of the evidence.

Plaintiffs next contend the court erred in refusing to hold defendants' failure to account for all production constituted a material breach of the leases justifying cancellation. From the evidence the court found unintentional failure to account for 542.76 barrels of oil. Plaintiffs insist the overwhelming and uncontradicted evidence showed "thousands of additional barrels of lease crude" owned by plaintiffs was wrongfully appropriated for use in the "frac oil business" by Illini.

■ Lengthy testimony was indulged by plaintiffs in their effort to establish wrongful appropriation of oil. The evidence showed oil was taken from the Gibson lease on several occasions, for use in "frac" treatment of other wells. Testimony of the employees, who handled bookkeeping procedures involving these matters, was that the amounts of oil taken for this purpose were checked back against the gauge tickets and oil run tickets until all oil used for "frac" treatment was credited back to the well from which borrowed from production on the well where used. Those employees testified all oil borrowed from the Gibson lease was returned in this manner. Despite plaintiffs' interpretation of the evidence upon this issue, and without consideration of whether the issue properly was injected into the trial, the trial court's finding is not clearly against the weight of the evidence.

Plaintiffs assert error in the trial court's failure in not ruling pendente lite move-

ments of oil production by defendants constituted lack of prudent operations and violation of implied terms of leases upon the property. Plaintiffs insist defendants "forcefully moved" onto the property and commenced producing oil without protecting the lessor's and/or cotenants rights in accounting for production. The evidence showed Ionic had taken over Illini's operation. After pumping and testing the wells during January and February 1961, Ionic, through defendant James Sellers, attempted to move back onto the premises to begin operations but were denied access to the property. This necessitated litigation of the injunction suit mentioned above.

Petition was filed in the present cause June 26, 1961. On February 7, 1963, during course of trial, plaintiffs secured an order requiring deposit in a named bank of all moneys accrued or accruing from the Gibson lease. Pursuant to other applications and motions by plaintiffs, an order was entered March 30, 1963, enjoining defendants and any party acting under defendants, from removing any oil from the property. On April 23, 1963, the trial court made a further order enjoining defendants handling of oil from the lease without full compliance with restrictive conditions set by the court. On April 29, 1963, the court appointed a receiver to handle the property and account for proceeds of operations.

A part of defendants' argument concerns operations prior to June 16, 1961, when Ionic took over from Illini, as well as a short period of operation by a trustee in behalf of interested owners. The contention necessarily involves the period between June 1961 and February 7, 1963, as to which plaintiffs assert error because of the trial court's failure to declare defendants' operations were imprudent and violative of the leases. No authority is offered to support the novel theory that failure of the trial court in this phase of

the matter was error. The five claimed factual bases therefor evolved from evidentiary matters which arose during trial. The trial court sustained plaintiffs' motions, and effectively controlled operations, by divesting defendants of independent operation and appointment of a receiver. On what basis the trial court sua sponte should have adjudicated one of the alleged issues "pendente lite" we are not advised.

Further error is alleged because the court sustained defendant Gibson's demurrer to plaintiffs Henrys' evidence, insofar as they sought subrogation to bank's mortgage which plaintiffs assumed and paid in reliance upon the warranty deed received from the Wrights. This claim is urged for the reason that, by separate deeds from Wright defendant Gibson acquired $\frac{9}{48}$ths undivided mineral interest, half of which was conveyed by mineral deed executed before plaintiffs purchased the land, but subsequent to date of the bank's mortgage. Plaintiffs insist an attorney-client relationship existed between Gibson and Wrights; that Gibson prepared the deed under which they purchased, and upon their own payment of the assumed mortgage debt Gibson was unjustly enriched. This contention is without merit under prior decisions. Kahn v. McConnell, 37 Okl. 219, 131 P. 682, 47 L.R.A.,N.S., 1189; Tynes v. Smith, 105 Okl. 100, 234 P. 637; J. A. Tobin Construction Co. v. Grandview Bank, Okl., 424 P.2d 81.

Although other matters have been urged by plaintiffs in this appeal, careful examination of this record fails to disclose need for separate consideration. The judgment of the trial court is not clearly against the weight of the evidence.

Judgment affirmed.

JACKSON, C. J., IRWIN, V. C. J., and DAVISON, WILLIAMS, HODGES, LAVENDER and McINERNEY, JJ., concur.