OIL VALLEY PETROLEUM v. MOORE
2023 OK 90
Case Number: 119810
Decided: 09/19/2023
As Corrected: October 3, 2023
OIL VALLEY PETROLEUM, LLC,
Cite as: 2023 OK 90, __ P.3d __

 

 

Plaintiff/Appellant,
v.
CLAY E. MOORE, an individual, or his Heirs, Executors, Administrators, Trustees, Devisees, Successors, Agents, or Assigns, Defendant/Appellee.

CERTIORARI TO THE COURT OF CIVIL APPEALS, DIVISION I

¶0 Plaintiff filed a proceeding in the District Court for Dewey County and requested the trial court to quiet title, cancel an oil and gas lease, and declare its top-lease to be in force and effect. Defendant moved for summary adjudication. Plaintiff also moved for summary adjudication. The Honorable Celo J. Harrel, Associate District Judge, granted defendant's motion and denied plaintiff's motion. Plaintiff appealed and the Court of Civil Appeals reversed the judgment of the District Court and directed judgment for plaintiff. Defendant sought certiorari to review the opinion by the Court of Civil Appeals, and certiorari was granted. We hold: (1) Exhibits presented during summary adjudication proceedings were insufficient to show a material fact that a well was commercially profitable for the purpose of the habendum clause of an oil and gas lease; (2) An overriding royalty interest may be extinguished by an extinguishment of the working interest from which it was carved by a lessee's surrender of the lease in substantial compliance with the lease, unless the surrender is the result of fraud or breach of a fiduciary relationship; and (3) Prevailing party status for the purpose of an attorney fee is determined in the trial court when not determined on appeal.

CERTIORARI PREVIOUSLY GRANTED; OPINION OF THE COURT OF CIVIL
APPEALS VACATED; ORDER OF THE DISTRICT COURT REVERSED;
AND CAUSE REMANDED FOR ADDITIONAL PROCEEDINGS

Joseph M. Vorndran, Breanne M. Gordon, Stuart & Clover, PLLC, Shawnee, Oklahoma, for Plaintiff/Appellant.

Michael Kelly, Long, Claypole & Blakley Law, PLC, Enid, Oklahoma, for Defendant/Appellee on appeal and certiorari.

Jana Knott, Bass Law, Oklahoma City, Oklahoma, for Defendant/Appellee on certiorari.

Kraettli Q. Epperson, Mee Hoge PLLP, Oklahoma City, Oklahoma, Amicus Curiae.

EDMONDSON, J.

I. Introduction and Summary

¶1 Plaintiff, Oil Valley Petroleum, LLC, (Oil Valley) and defendant, Clay Moore, (Moore), sought equitable relief in the District Court to adjudicate title based upon two oil and gas leases. Their arguments may be simplified: (1) Oil Valley claims its title is based upon a top-lease and a release by a lessee of its interest in a well; and (2) Moore claims his title is based upon the base or bottom lease and production from that same well, with an added allegation of unclean hands by Oil Valley. Oil Valley claims a release creates a washout of Moore's interests because the released well was the only well keeping the lease in effect during the secondary term of the lease. As we explain, Moore and the amicus curiae use the term "washout" to describe an interest in a lease that is extinguished with an added element of alleged wrongfulness by the person causing the extinguishment. Moore states production from the well kept the lease in effect regardless of the release.

¶2 Amicus curiae on certiorari correctly identifies the issues presented to us by the parties: Whether a lessee's release of a lease may extinguish another's interests in the base oil and gas lease when a claim is made of continuing production holding the lease, and whether this production may be used to show a party's "unclean hands" or constructive fraud in obtaining the release. Amicus curiae indicates a quiet title proceeding is a form of equitable relief, and all circumstances must be considered.amicus curiae appear to argue the fact of production would necessarily show a type of fraud or estoppel relating to a release. However, because elements for fraud or estoppel theories are not identified as such for facts specific to Moore's claim, their argument may also be read as indicating production from the well and conduct of the parties relating to the release are simply two of several factors to be considered supporting a claim in equity to quiet title and cancel an oil and gas lease. We agree that a trial court proceeding in equity must consider all circumstances when parties seek to cancel an oil and gas lease and adjudicate title.

¶3 The parties used a partial summary adjudication procedure for a decision by the trial court. Moore sought and was granted partial summary relief. Although he argued the well was producing, he did not supply facts necessary to show the well was commercially profitable. The fact of commercial profitability was raised and disputed by Oil Valley during the partial summary relief proceedings. Moore's allegation of Oil Valley's unclean hands was not addressed in the summary relief proceedings other than what appears to be a legal conclusion by Moore based upon his allegation the well continued to produce, and that Oil Valley obtained both the top-lease and the release. Moore did not address when facts are sufficient to show unclean hands, estoppel, or a constructive fraud. Oil Valley did not address whether fraud or breach of a fiduciary duty may invalidate a lessee's release of an interest in a lease.

¶4 We may address a trial court's grant of interlocutory summary relief when an appeal is brought from a subsequent judgment.e.g., whether the well was commercially profitable. This order must be reversed.

¶5 The trial court also pronounced a subsequent final order that granted judgment to Oil Valley on a counterclaim raised by Moore. The parties did not supply in the appellate record any of their trial court motions used by the trial court when adjudicating this counterclaim. There is no discussion by the parties whether this final adjudication relied in any part, or to any degree, on the interlocutory partial summary adjudication reversed herein. We do not address the final order.

¶6 Oil Valley sought partial summary relief on the quiet title claim and its request was denied. Oil Valley raised the fact of the release, claimed the well was not producing, and argued Moore was required to commence drilling operations and produce after the release was filed in Dewey County. Oil Valley did not address elements to a claim in equity to cancel an oil and gas lease based upon all of the circumstances in the controversy. Oil Valley does not show on appeal that its request for partial summary relief is within a narrow category of appellate review when a trial court's denial of summary relief is reversed on appeal.

¶7 We hold: (1) Exhibits presented during partial summary adjudication proceedings were insufficient to show a material fact that a well was commercially profitable for the purpose of the habendum clause of an oil and gas lease; (2) An overriding royalty interest may be extinguished by an extinguishment of the working interest from which it was carved by lessee's surrender in substantial compliance with the lease, unless the surrender is the result of fraud or breach of a fiduciary relationship; and (3) Prevailing party status for the purpose of an attorney fee must be determined in the trial court. We also conclude we will not make a first instance adjudication of rights and obligations of parties to a lease and top-lease when the facts were not developed in the trial court equitable proceeding and are not before us in the appellate record.

II. First Lease, First Well, Assignments, Release, Second Lease, and Second Well

¶8 Waban Oil Corporation (Waban) executed an oil and gas lease to Athan Inc. (Athan) in 1980. The Athan lease covered a one-half interest in the minerals in and under the SW/4 of Section 24, Township 17 North, Range 14 West of the Indian Meridian in Dewey County, Oklahoma. Athan assigned all of its interest in the Athan lease to Mustang Production Company, approximately two weeks later on March 24, 1980.

¶9 The Ball #1-24 well was drilled to a depth of 9,700 feet, and completed in February 1981 for producing gas and gas condensate. Completion of the well occurred during the three-year primary term in the Athan lease. The Oklahoma Corporation Commission created a 640-acre drilling and spacing unit for Section 24, T17N-R14W, and included the Ball #1-24 well.

¶10 Mustang made two assignments and divided its interest in the Athan lease based upon depth from the surface and also created an override interest. Mustang's first assignment was made in June 1981 to Funk Exploration. Mustang assigned its "right, title and interest" in the Waban Athan lease "from the surface of the earth to the stratigraphic equivalent of 9,747 feet (being the total depth drilled and logged plus 50' ), . . . in the Ball #1-24 well."

¶11 Mustang's second assignment was made approximately ten years later in November 1991 (effective Jan. 1, 1992), by its successor, Mustang Fuel Corporation, to Clay E. Moore (Moore). Mustang assigned "all of Assignor's interest" created by "lessor Waban Oil Corporation" (i.e., the Athan lease), excluding rights to wells and wellbore rights retained by the assignor.

¶12 Mustang's first assignment with its assignment of shallow rightsi.e., "from the surface of the earth to the stratigraphic equivalent of 9,747 feet including the Ball #1-24 well," was subsequently possessed by Staab Holdings, LLC, (Staab), "as successor to Funk."

¶13 In June 2017, Waban, as lessor, executed a second oil and gas lease for property described in the Athan lease. The lessee is plaintiff, Oil Valley Petroleum, LLC (Oil Valley). Both Moore and Oil Valley view this second lease as a "top-lease" when it was executed in June 2017. A "top-lease" is a lease subject to a pre-existing lease that has not expired,

¶14 Based on Oil Valley's subsequent actions, the Corporation Commission granted a drilling permit for the Holsapple #1-24-13XH well (Holsapple Well) to Council Oak Resources, LLC (Council Oak). The permit to drill was granted on May 21, 2018, and this well was completed at a vertical depth of 11,524 feet.

¶15 The parties agree the lease and assignments occurred, that a release was filed, and a top-lease was created. However, this agreement appears to be partially inconsistent with part of Moore's argument during the partial summary adjudication proceedings which referenced "other working interest owners" in the Ball #1-24 well. The parties disagree on the effect of the March 2018 release on the 1980 Athan lease, e.g., whether Moore's rights were extinguished by the release.

III. District Court Proceedings, Appeal, and Certiorari

¶16 In July 2018, Oil Valley filed this proceeding in District Court of Dewey County to quiet title in its favor, cancel the Athan lease, and declare the second lease by Waban, the June 2017 top-lease, to be in full force and effect. The controversy is between Oil Valley claiming rights pursuant to the release by Staab and the top-lease, and Moore claiming rights below the stratigraphic equivalent of 9,947 feet based upon the Athan lease, an assignment to him from Mustang, and production from the Ball #1-24 well.

¶17 Moore requested "summary judgment" on the quiet title issue concerning the continued effect of the Athan lease and on the "present effect" of the top-lease. Moore argued the Ball #1-24 Well "is and has been continuously producing and/or capable of producing in paying quantities since completion through November 2018."

¶18 Exhibit "F" shows a value of $24.91 attributed to Moore's override in the Ball #1-24 well during November 2018, and a check paid to Moore in the amount of $145.87 for production from three wells which included the Ball #1-24. However, Moore also attached Exhibit "G" with information from the Oklahoma Tax Commission's PUN form (Production Unit Number form) to show production from the Ball #1-24 well. The PUN form for the well in 2018 shows production in January, March, and May of 2018, but no production during the last seven months of 2018. Moore's Answer in the District Court pled that Golden Gas Service Company is the operator of the Ball #1-24 well, and Moore's motion for summary relief states he has received "remittance advices from DCP Operating Company, LP" for production as recent as November 2018.

¶19 Oil Valley responded and also sought "summary judgment" on the quiet title issue of the Athan lease and the top-lease. Oil Valley argued Staab's release caused Moore's interest to be "completely extinguished pursuant to the express terms of the original oil & gas lease from which his interests' validity depended."

¶20 In addition to invoking the Athan lease's surrender clause, Oil Valley made an additional three arguments. The first two are: (1) The terms of the Athan lease's habendum clause required a well to be capable of production "by the lessee" which did not continue after the release was filed; and (2) The Athan lease contains a drilling and reworking sixty-day cessation of production clause by a lessee for keeping the Athan lease in effect, and no further drilling or reworking activity occurred pursuant to the Athan lease prior to and after the release. In other words, Staab's release of the Athan lease's "shallow rights" with its Ball #1-24 well caused the following results: (1) No Athan lessee continued production pursuant to the lease's habendum clause; and (2) No Athan lessee, including Moore as to his deep rights, satisfied the cessation of production clause to preserve the Athan lease by commencing drilling in the 60-day period after Staab's release was filed. In summary, Oil Valley argued the top-lease ripened or became effective after this 60-day post-release period without commencement of production by a lessee on the Athan lease.

¶21 A third argument by Oil Valley was Moore failed to produce any facts concerning the costs associated with production from the Ball #1-24 well. Oil Valley agreed Moore had received $24.91 from production in November 2018. Oil Valley pointed to Moore's deposition stating he had not reviewed "any expense information from the Ball #1-24 Well." Oil Valley argued Moore's motion for summary judgment failed to address profitability of the Ball #1-24 well, and that production in paying quantities for the purpose of the Athan lease means, in part, production must be in paying quantities for cost-bearing interests. In other words, a lease-based obligation of owners of working interests to produce must include whether an ability to create a profit exists.

¶22 Moore replied and argued information submitted showing a "record of production" showed the well was capable of producing in paying quantities. The reply did not point to any exhibit showing costs associated with the Ball #1-24 well or its profitability. Moore stated in his deposition he had been informed that the well was a "profitable well" when he telephoned an operator for an opinion.

¶23 Moore's reply argued the Staab release had the effect of releasing only one part of the Athan leasehold: "A voluntary release of a small portion of the acreage, or an individual formation, could have no effect on all the other acreage and all the other formations which had become subject to the continuing production clause of the Lease."

¶24 Moore also argued the other operator and other working interest owners in the Ball #1-24 well continued to produce from the well, "which would continue to hold the Athan Lease."in praesenti of oil and gas to be captured in the lands described during the term demised and for so long thereafter as these substances may be produced."

¶25 Moore's reply also states several additional facts not supported by any exhibits. Moore states the following.

The "facts" are that . . . D. When Oil Valley obtained a release of the Athan shallow leasehold rights from Staab in October, 2017, it did not "automatically" release the Deep Rights held by Moore, as Staab had no interest in nor power to release rights he did not own. . . F. Staab's release of only its rights in the Athan lease, which was only in the Southwest Quarter, had no effect on Staab's and any other party's rights in the rest of Section 24, nor on the rights of those other lessees to continue producing from the Ball 1-24 wellbore on the Southwest Quarter, and thus maintain all leases in Section 24 in force.

Moore's Reply on summary adjudication at.5. The argument references "other lessees . . . producing from the Ball 1-24 wellbore," but does not tie this language to a stated identifiable interest arising from the Athan lease. Moore states this production continued "through at least November 2018, which was several months after the new Holsapple well was commenced in May, 2018, on section 24."

¶26 Moore and Oil Valley filed supplemental briefs on the effect of Staab's release on Moore's interests. Moore relied on a 1974 opinion from the Louisiana Supreme Court and a 2015 opinion from an Ohio appellate court.

¶27 The trial court granted Moore's motion for summary judgment, and denied Oil Valley's motion for summary judgment. Moore's Answer included a counterclaim to quiet title, and damages for slander of title and tortious interference with business relations. The trial court's adjudication in July 2019 on Moore's summary judgment motion did not expressly include his claims for damages.

¶28 In August 2021, the trial court denied Moore's "motion for partial summary judgment" on his claim for tortious interference with business relations. The trial court also granted Oil Valley's "counter motion for summary judgment" on Moore's claim for tortious interference with business relations. Motions, if any, specifically addressing slander of title or tortious interference are not included in the record on appeal, and we do not review the August 2021 order granting Oil Valley's counter motion.

¶29 Oil Valley appealed. The Court of Civil Appeals reversed the judgment of the trial court, and concluded the trial court should have granted Oil Valley's motion for summary judgment. Moore filed a petition for certiorari to review the opinion by the Court of Civil Appeals, and the petition was granted.

¶30 Moore's petition for certiorari asserts: (1) Moore's "deep rights" were preserved by production from the Ball #1-24 well pursuant to the habendum clause in the Athan lease; (2) The Staab Release "had no legal effect on his [Moore's] interests" as to both his override interest in the Athan lease and his "Deep Rights;" and (3) Even assuming Staab's release did destroy Moore's override and deep lease rights in the Athan lease, the appellate court allegedly made an improper finding of fact concerning the Athan lease's cessation of production clause because "the District Court did not determine whether the 'continuous drilling clause had even been triggered in the case because the lower court concluded that Staab's release of the shallow rights did not release Moore's interests because Moore's interests continued to be held by production."

¶31 Oil Valley's answer to the certiorari petition discusses the nature of Moore's interests, the habendum clause, and Staab's release. Oil Valley construes the appellate opinion's reference to additional drilling as a comment on Moore possessing a right to drill to the formation depth Moore possessed under the Athan lease after the Staab release was filed, provided Moore complied with a continuous drilling clause in the Athan lease. Oil Valley's answer on certiorari also asserts that after Staab's release was filed "[a]ny further production from the Ball 1-24 well was produced pursuant to Oil Valley's Top Lease."

¶32 Moore's reply on certiorari objects to Oil Valley asserting "as a material fact" that "'[i]mmediately upon Staab's filing of the Release of Oil & Gas Lease' on March 5, 2018, 'all production ceased from the Ball #1-24 well pursuant to the Base Lease." Moore states this "is a misstatement of basic oil and gas principles" as opposed to a statement of fact. Moore argues the cessation of physical production from the well was required to commence the effect of the 60-day continuous drilling clause.

¶33 Amicus curiae filed a brief in support of the petition for certiorari and argues a washout of an overriding royalty interest should be protected from constructive fraud.

IV. Standard of Review

¶34 Our review of an order granting an interlocutory partial summary adjudication upon appeal of the subsequent judgment is similar to our review of a motion for summary judgment, and we examine the trial court submissions actually used by the parties and the trial court to adjudicate the motion.

¶35 When a trial court's summary judgment is based upon an issue of law adjudicating the meaning of contractual language, then we exercise a de novo appellate review of an assignment of error challenging the trial court's legal conclusion.de novo appellate review on an issue of law.

¶36 Oil Valley argued a material fact was missing from Moore's partial summary adjudication motion which sought to enforce the habendum clause, e.g., Oil Valley argued the fact of profitability from production was not raised by Moore in his request for summary adjudication. Moore, as a moving party granted summary adjudication, had a burden to establish that no dispute as to a material fact existed.on summary judgment does not arise until Moore as movant satisfies his initial burden to show profitability of the well as a fact necessary to Moore's cause seeking to enforce the habendum clause against Oil Valley.

¶37 Summary judgment is an adjudication on the merits of the controversy.de novo appellate review.

¶38 An oil and gas lease is construed as a contract.

¶39 The trial court both granted and denied requests for partial summary adjudication. The denial of a motion for summary judgment is generally not appealable, including after a trial on the merits, except in certain circumstances where a judgment on a cause of action is required as a matter of law.e.g., the legal effect of a lessee's release of an interest in an oil and gas lease. We conclude Oil Valley's claim in equity does not rest upon a single issue of law requiring a judgment in appeal on its quiet title clam.

V. Analysis
V(A). Partial Summary Relief Granted to Moore

¶40 In summary, Moore argued his overriding royalty interest in shallow zone production from the Ball #1-24 well and his assigned interest in a deeper zone continued in effect, or were "held," by the production from this well. Moore relied upon the habendum clause in the Athan base lease

¶41 The phrases "base lease" or "bottom lease" are often used to identify an earlier oil and gas lease which controls or defines oil and gas rights in subsequent conveyances involving the same leased premises.

¶42 The Athan lease contains a clause stating the lease will remain in force for three years as the primary term, and as long thereafter oil and gas or either of them is produced by the lessee. This language specifies a primary term with a habendum clause. The phrases "primary term" and "habendum clause" have well-known meanings in our jurisprudence.

¶43 One court has explained an incomplete but useful definition for a "primary term" as the period of time stated in the lease "during which the lease may be kept alive by a lessee by virtue of drilling operations or the payment of rentals, even though there is no production in paying quantities, . . . [and] is also a period of time at the end of which the estate granted will terminate but which estate may be extended by some other provision, usually one for production."Hall v. Glamor, 2018 OK 59427 P.3d 1052Id. 2018 OK 59

¶44 In Rist v. Westhoma Oil Co., 1963 OK 126385 P.2d 791Id. 385 P.2d at 796. We explained the parties entered into a lease agreement for a primary term "to be extended on production" from the area described "with no thought in mind of a severance as to horizontal divisions." In summary, if one lessee performed a lease-created obligation towards the lessor which continued the life of a base lease between lessor and lessee as to one lessee of a horizontal interest; then a second lessee possessing a different horizontal interest could rely on the first lessee's performance to preserve the life of the base lease as to the second lessee.

¶45 Several years later in 1982, we addressed circumstances where a mechanical difficulty caused a cessation of production and then a second well drilled to the same formation continued production. State ex rel. Commissioners of the Land Office v. Amoco Production Co., 1982 OK 14645 P.2d 468Amoco Production Company v. Braslau, 561 S.W.2d 805 (Tex.1978), where a mechanical difficulty caused a casing collapse inside the well bore, and a second well was drilled, "even drilled to a different formation, kept the lease alive." State ex rel. Commissioners v. Amoco Production Co., 645 P.2d at 471.

¶46 A few years later our Court of Civil Appeals relied on Rist in Martens v. Kaiser--Francis Oil Co., 1989 OK CIV APP 3768 P.2d 383Hall v. Glamor, supra, the application of 52 O.S. §87.1

¶47 Both parties agree that satisfaction of a base lease habendum clause by production from one formation in a leased premises by a lessee may satisfy the base lease habendum clause as to another formation in the same leased premises. Oil Valley asserts Moore's overriding royalty interest and deep rights interest could be held by production from the shallow Ball #1-24 well, but could not be held by that well after the release was filed by Staab. The parties do not expressly discuss if Moore had a duty to Athan to develop the deeper zones between January 1, 1992, and the date Staab's release was filed twenty-six years later on March 5, 2018. However, one of Moore's arguments appears to indicate Oil Valley's Holsapple Well satisfies Moore's duty. Predictably, Oil Valley states the Holsapple Well was not drilled by Moore, as a lessee by assignment, and the well satisfies no duty owed by Moore arising from the Athan lease. Oil Valley also asserts any production from the Ball #1-24 well after the date of release was filed is deemed to be production by Oil Valley from the well pursuant to the top-lease.

¶48 Both parties agree satisfaction of the Athan lease habendum clause by production from one formation in a leased premises satisfies the base lease habendum clause as to another formation in the same leased premises. This agreement concerning the Athan lease does not contravene public policy on the basis of Rist v. Westhoma Oil Co., supra, and is part of this controversy as shaped by the parties for our review.

¶49 In Pack v. Santa Fe Minerals, 1994 OK 23869 P.2d 323Hoyt v. Continental Oil, 1980 OK 1606 P.2d 560Pack, 1994 OK ¶23, 869 P.2d at 323. In Mitchell v. Amerada Hess Corp., 1981 OK 149638 P.2d 441probability of potential profit, and one purpose for an oil and gas lease is "to make the extraction of oil and gas from the leased lands of mutual advantage and profit to the lessor and lessee." Id. 638 P.2d at 448-50 (emphasis added). In Tres C, LLC v. Raker Resources, LLC, 2023 OK 13532 P.3d 1profitability on an oil and gas lease should be determined. Id. 2023 OK 1

¶50 Moore supplied an exhibit showing a value of $24.91 attributed to Moore's override in the Ball #1-24 well during November 2018. We have explained an overriding royalty interest is such that only when oil and gas are reduced to possession does the interest attach, and "prior to this event the owner of an override has no assertable right in the leasehold."

¶51 The payment of $24.91 for Moore's overriding royalty interest, by itself, does not show the well's commercial profitability. Moore also supplied additional documentation showing production. However, this documentation was not placed in any economic context regarding cost of production, and nothing before the trial court shows profitability of the well. Additionally, two of the exhibits presented by Moore, "F" and "G" appear to conflict on whether production last occurred in either May or November 2018.

¶52 We have also explained a well must be capable of producing in paying quantities, and "the viability of a mineral-interest lease depends largely upon whether a well is capable of production in paying quantities, i.e., the characteristic that distinguishes a 'shut-in' well from a well experiencing a 'cessation of production.'"

¶53 In summary, the fact of the well's commercial profitability was a material fact for Moore's claim he presented for summary relief against Oil Valley, and the fact was disputed by the parties during the partial summary relief proceedings. For example, Oil Valley argued "neither Plaintiff, nor the Defendant, can accurately plead or assert whether the Ball 1-24 produces and/or is capable of producing in paying quantities at this time."

V(B). The Release

¶54 Oil Valley argues it does not matter to Moore's equitable claim whether the Ball #1-24 well was profitable or capable of being commercially profitable. Oil Valley argues Staab's release extinguishes Moore's overriding royalty interest as well as Moore's deep rights as a lessee in the Athan lease. Moore disagrees. Oil Valley and Moore argue the dispositive issue on appeal and certiorari is which of two events takes precedence for title purposes, (1) a producing well as argued by Moore, or (2) a lessee's release as argued by Oil Valley.

¶55 Oil Valley argues Moore has no claim in equity. Oil Valley is mistaken. We have reaffirmed for several decades a party possessing an overriding royalty may challenge a surrender or release when alleging in an equitable proceeding the release or surrender was a result of fraud or a breach of a fiduciary duty.

¶56 Amicus curiae argues the dispositive issue of law in the appeal and on certiorari is whether a lessee in a base lease may file a release of those rights and extinguish an overriding interest and other working interests in the base lease if circumstances of the release constitute a constructive fraud in equity.

¶57 The term "washout" may be used to refer to extinguishing a nonoperating interest, such as an overriding royalty, by another's surrender or release of a lease. However, the term is often used when a party intentionally surrenders the lease and then reacquires the same lease free of the nonoperating interests which are "washed out" by the surrender.

¶58 For several decades, including a time prior to Moore obtaining his assignment, model operating agreements for those possessing an operating interest have often included provisions for abandonment and surrender of a lease as well as renewal or extension of a lease to prevent a washout.Rees v. Briscoe, 1957 OK 174315 P.2d 758Id. 315 P.2d at 761 (explanation added). Some courts have viewed a washout as not necessarily wrongful and prohibited by an oil and gas lease, but should be prohibited by express anti-washout provisions if desired by the parties.

¶59 A typical analysis of a washout in the absence of an anti-washout agreement includes an examination of the relationships of the parties to their interests and each other, e.g., the party surrendering a lease, the party whose interests are washed out, and the party obtaining an interest due to the washout. This analysis often examines whether parties possessed a fiduciary or confidential relationship. The analysis may also include whether a release, surrender, or forfeiture was obtained by fraud or collusion when circumstances for such are raised as an issue for adjudication by a party.Amicus curiae uses the term "washout" to describe conduct which is allegedly a constructive fraud, and Moore uses the term "estoppel," but they do not identify elements for a constructive fraud or estoppel claim within the context of the well-known "fraud or breach of a fiduciary relationship" exception for saving an overriding royalty from a lessee's surrender of a lease as noted herein. The parties may address this on remand with an opportunity to present all of the circumstances necessary for their competing claims in equity.

¶60 Moore pled he possessed two very different oil and gas interests, an overriding royalty interest in the Ball #1-24 well and assigned lessee rights in the Athan lease below the stratigraphic equivalent of 9,947 feet. The two interests must be addressed separately when examining a transaction that extinguishes interests created by a lease.

¶61 The nature of an overriding interest has often arisen in litigation involving implied covenants. In XAE Corp. v. SMR Property Management Co., 1998 OK 51968 P.2d 1201

This Court has said that, unless expressly assumed, implied covenants of an oil and gas leases do not extend to lease assignments with reservation of overriding royalty interest. Kile v. Amerada Petroleum Corp., [1925 OK 1006247 P. 681

Id. 1998 OK 51XAE, various implied covenants arising from an oil and gas lease did not apply to an overriding royalty interest "unless the contract of assignment imposed rights and obligations on the party the same as that of lessor and lessee." XAE concludes no implied covenants, including a covenant to produce, could be possessed by an overriding interest unless imposed by the contract of assignment.

¶62 Moore does not point to any language in (1) his assignment from Mustang Fuel Corporation for the creation of a obligation owed to Moore that would prevent a extinguishment by conduct of either working interest owners in the Ball #1-24 well or Oil Valley, or (2) any agreement creating an anti-washout right for Moore with respect to these working interest owners or Oil Valley.

¶63 Moore does not argue an implied anti-washout covenant arises from the Athan lease. However, his interpretation of the Athan lease during partial summary adjudication proceedings indicates a view that the habendum clause: (1) Gives the clause the effect of an anti-washout provision by making the Athan lease's release clause subservient to the habendum clause; or (2) Makes production satisfying the habendum clause sufficient to make a surrender of the lease a factual circumstance which necessarily results in fraud or a breach of a fiduciary duty, and that such is a wrongful extinguishment.

¶64 XAE also noted the following concerning the possessor of an overriding royalty interest which is lost or extinguished.

The nature of an overriding royalty interest is such that it attaches only when oil and gas are reduced to possession. Before this, the owner of an overriding royalty has no assertable right in the leasehold and the vesting of such owner's rights are dependent upon the happening of a future event or condition. De Mik v. Cargill, 1971 OK 61485 P.2d 229In De Mik we held that an overriding royalty was lost upon renewal of the oil and gas lease because, absent fraud or breach of a fiduciary relationship, the interest did not continue and attach to subsequent leases secured in good faith by the lessee.

Id. 1998 OK 51Id. Our explanation in XAE relied upon De Mik v. Cargill, 1971 OK 61485 P.2d 229

[A]n overriding royalty may be lost entirely by expiration of the primary lease since, absent fraud or breach of fiduciary relationship, the interest does not continue and attach to a subsequent lease secured, in good faith, by the lessee. . . Neither does an overriding royalty survive cancellation, surrender, abandonment resulting from diminution of production beyond economic feasibility, nor total failure to secure production in paying quantities.

Id. 485 P.2d at 233 (emphasis added). This language in De Mik agrees with language we used in Thornburgh v. Cole, 1949 OK 167207 P.2d 1096La Laguna Ranch Company v. Dodge, 18 Cal.2d 132, 114 P.2d 351, 135 A.L.R. 546 (1941), and explained an overriding royalty interest was lost or "extinguished" by the lessee surrendering the lease when quit-claiming to the lessor, unless extinguishing the override was prevented by the instrument that created the override. Thornburgh, 207 P.2d at 1100. We explained this extinguishment of the override occurred in La Laguna Ranch Company "because the agreement did not provide that the overriding royalty should apply to renewal, extension or modification of the lease." Id.

¶65 In summary, our opinions spanning several decades in XAE, De Mik, Thornburgh, and Kile explain an overriding royalty interest being lost or extinguished when the lessee's working interest that was used to carve out the override was itself lost or extinguished. These opinions indicate an overriding royalty extinguished by extinguishing its related working interest is not within the traditional class of constructive frauds when these frauds are defined by the nature and subject of the transaction itself.XAE and earlier opinions when the "overriding royalty was lost" because of "fraud or breach of a fiduciary relationship." XAE, 1998 OK 51

¶66 Amicus curiae raises the issue of "constructive fraud" occurring with extinguishing an override, such as a lessee's release of a lease. We have explained a constructive fraud "is a breach of either a legal or equitable duty, [and] does not necessarily involve any moral guilt, intent to deceive, or actual dishonesty of purpose ... [and] may be defined as any breach of a duty which, regardless of the actor's intent, gains an advantage for the actor by misleading another to his prejudice."

¶67 Amicus curiae challenges a lessee's release and asserts: "The owner of a lease does have certain obligations which the owner of overriding royalty may enforce. For example, the owner of the lease may not surrender a producing lease and thereby destroy the overriding royalty"Krug v. Helmerich & Payne, Inc., 2013 OK 104not support a general proposition that Oklahoma law recognizes a fiduciary duty between lessors and lessees in an oil and gas lease. Id. 2013 OK 104amicus curiae appears to state the fact of production creates a duty by the lessee to not surrender the lease.

¶68 Oil Valley was not a lessor or lessee in the Athan lease. Amicus curiae makes a claim Staab breached a duty to Moore when Staab made the release. Then amicus curiae makes Oil Valley a part of duty being breached by both Waban and Staab by alleging Oil Valley conspired with Staab and Waban. Amicus curiae's argument is that allowing a release when a well is commercially profitable allows "a lessor [Waban] and partial lessee [Staab] to conspire (constructive fraud) to eliminate an outstanding recorded real property interest to the detriment of the title holder (the Deep Rights and an ORRI carved from the Base Lease) contrary to the terms of the Base Lease."

¶69 Of course, constructive fraud is well-known and may arise in various contexts, including a real estate transaction when a party's conduct shows "unclean hands" in the transaction.based upon a party's conduct involving the breach of a legal or equitable duty. Similarly, a lessee's mere release or surrender of interest in an oil and gas lease is not intrinsically constructive fraud.

¶70 Amicus curiae's argument is based upon a fact not shown in the record on appeal. Amicus curiae seeks an adjudication and explanation of duties and obligations of lessors, lessees, and others acting with them when a lease is held by production in commercially paying quantities. We have explained the record in this appeal does not show the Ball #1-24 well was commercially profitable in paying quantities. Adjudicating whether Moore's override was improperly extinguished due to the presence of a fraud or a breach of a fiduciary relationship and based upon the fact of production in paying quantities when the record does not state whether this fact exists, would make our pronouncement an improper advisory opinion.

¶71 Oil Valley's response to amicus curiae states allegations of "conspiracy and/or constructive fraud" were not "directly asserted" by Moore, but "Appellee [Moore] raised similar arguments with their [sic] causes of action for slander of title and tortious interference with a business relationship, however the trial court granted Appellant's motion for partial summary judgment with regard to these claims."amicus curiae raising and discussing constructive fraud.

¶72 Moore's answer to Oil Valley's petition alleges the latter had "unclean hands" and an allegation Oil Valley's claims were "precluded by principles of equity, equitable considerations and the abhorrence of forfeitures." Moore pleads legal conclusions of estoppel, quasi-estoppel, and judicial estoppel in answer to Oil Valley's petition. Moore also alleges Oil Valley's conduct was "misleading" and "maliciously seeking to have other working interest owners having an interest at shallower depths . . . release their interest(s) to the detriment of Moore;" and these claims are made as part of Count III, a slander of title counterclaim, and then incorporated by reference in Count IV, a tortious interference counterclaim.

¶73 Oil Valley's argument in an equitable proceeding is that Moore made specific allegations alleging improper behavior by Oil Valley in Moore's Answer in Count III, and then incorporated into Count IV; but Moore failed to incorporate them in earlier Count II, the quiet title counterclaim. Oil Valley's argument is similar to former practice when a bill in chancery was subject to attack because a fact was pled in one part of the bill and not another.

¶74 We have stated: "The general philosophy of the Pleading Code is that pleadings should give fair notice of the claim."e.g., in a pleading, in a list of disputed or non-disputed facts in a motion for summary judgment, and testimony. Oil Valley's issue is whether it received "fair notice" of Moore's quiet title claim based on "unclean hands" for the purpose of the scope of issues properly addressed by amicus curiae.

¶75 We agree an amicus curiae is not allowed to expand a record on appeal or the issues raised in the trial tribunal.

¶76 Some courts have stated the basis for equitable estoppel may include fraud,

¶77 Whether Moore properly pled circumstances of an estoppel or a constructive fraud was not addressed in the trial court, in part because of the unusual procedure used by both Moore and Oil Valley with each seeking an adjudication of a title in equity by a single alleged fact; and then seeking an appellate review whether a single fact was sufficient to create a title and cancel an oil and gas lease. For Oil Valley's argument, the alleged fact of a lessee's release, once proven, meant it should be awarded title. For Moore's argument, the alleged fact of continued production, once proven, meant he should be awarded title. We conclude that the arguments raised by amicus curiae do not impermissibly expand the scope of issues raised in this controversy by the parties.

¶78 The Athan lease provides in part the following: "Lessee may at any time and from time to time surrender this lease as to any part or parts of the leased premises by delivering or mailing a release thereof to lessor, or by placing a release of record in the proper County." We have explained a surrender or release of a lease in substantial compliance with the terms of the lease will be given effect.

¶79 Oil Valley argues in response to amicus curiae that: "Appellee has admitted within its own pleadings that the Top Lease became effective as to the shallow rights upon the execution of the release by Staab."

¶80 Moore's focus on asserting production from the Ball # 1-24 well argues a release has no effect on his interests. He relies on Scurlock Oil Co. v. Getty Oil Co., 294 So.2d 810 (La.1974), and Marshall v. Beekay Co., 2015-Ohio-238, 27 N.E.3d 1 (4th Dist. 2015). Scurlock discussed the effect of a quitclaim in Louisiana and held an instrument in which a party did "release, relinquish and quit claim all of its rights" applied to the party's "retained rights" possessed at time of the release. Id. 294 So.2d at 820. In Marshall the court held that when a lease grants rights to all depths without distinction, then an assignment of shallow rights did not "sever the leasehold," and shallow production in paying qualities from a shallow-depth well held the entire lease, including the deep rights. Id. 27 N.E.3d 8-9. Neither of these opinions support Moore's argument. They are not persuasive on the issues before us to adjudicate.

¶81 Several arguments are made concerning Moore's obligations and rights based upon his status as a lessee of the deep strata rights pursuant to the Athan lease. For example, on certiorari, Oil Valley argues "Moore took no action whatsoever to develop his interest in the Deep Rights . . . during the approximately twenty-five years he owned said rights." Further, that even after Staab recorded the release on March 5, 2018, "Moore took no action under the sixty (60) day Cessation of Production Clause to engage in operations for drilling or reworking of a well." Oil Valley also alleges Moore, as a lessee, breached implied covenants. Moore states these arguments are of a type to be raised by a lessor to a lease, and not Oil Valley as a stranger to the Athan lease.

¶82 Oil Valley's argument is based upon Ball #1-24 well having ceased to produce in commercially paying quantities. Both Oil Valley and Moore agree that the Ball #1-24 well held the Athan lease when it was producing in commercially paying quantities. However, Oil Valley argues after the release was filed (or executed) any production from the Ball #1-24 well should be attributed to Oil Valley pursuant to the top-lease, because no lessee "pursuant to the Athan lease" was producing from the well. Continued production from the Ball #1-24 well was one fact Moore desired to use to show the unclean hands of Oil Valley for the purpose of challenging the release and top-lease in equity. This alleged fact has not been adjudicated by the District Court.

¶83 We conclude the trial court record is insufficient for adjudicating the issues concerning Moore's rights and duties as a lessee in the base lease on Moore's claim in equity that Oil Valley had unclean hands. Additionally, nothing in the record suggests the trial court actually decided these issues as part of its quiet title adjudication. We do not analyze Moore's rights and obligations as a lessee in the Athan lease for the purpose of competing quiet title claims brought by the parties.

VI. Attorney Fees and Costs

¶84 Oil Valley filed an application for attorney fees and costs and relied on 12 O.S. § 696.412 O.S.2011 § 1141.1

¶85 Oklahoma Supreme Court Rule 1.14(A)(1) states the applicant "shall file with the Clerk a verified statement of taxable cost items showing that person has paid the same." We need not discuss costs authorized by 12 O.S.2021 § 978

¶86 A motion for attorney fees for services performed on appeal shall be made to the appellate court by separate motion filed any time before issuance of mandate. 12 O.S.Supp.2012 §696.4Id.

¶87 Oil Valley relies upon the Nonjudicial Marketable Title Procedures Act, (NMTPA), 12 O.S.2011 § 1141.1as a prevailing party. In Stump v. Cheek, 2007 OK 97179 P.3d 606

¶88 In GRP of Texas, Inc. v. Eateries, Inc., 2001 OK 5327 P.3d 95

If the right of a party to recover attorney fees depends upon a determination that the party has prevailed in an action, and if the prevailing party in the action cannot be determined from the decision of the appellate court, an application for attorney fees for services performed on appeal shall be made to the trial court in the manner and within the time provided in subsection B of this section.

12 O.S.2021 §696.412 O.S.2021 § 696.4

VII. Conclusion

¶89 Exhibits presented during partial summary adjudication proceedings by Moore were insufficient to show the Ball #1-24 well was commercially profitable and producing in paying quantities. The parties disputed whether the well was producing in paying quantities. Whether the well was producing in paying quantities was a material fact for an element of Moore's equitable claim against Oil Valley based on the habendum clause.

¶90 Oil Valley argued whether the well was profitable did not matter, and Moore had no claim in equity because Oil Valley had a lessee's surrender or release of interest in the well. Moore's claim was not limited to whether the well was commercially profitable in paying quantities. Moore alleged Oil Valley had unclean hands when obtaining the top-lease and the release. An overriding royalty interest may be extinguished by an extinguishment of the working interest from which the override was carved by lessee's surrender in substantial compliance with the lease, unless the surrender is the result of fraud or breach of a fiduciary relationship. Moore and amicus curiae appear to argue a "washout" necessarily falls within the well-known "fraud or breach of fiduciary relationship" exception to extinguishing an overriding royalty interest when a well has commercially profitable production at the time a lessee surrenders a lease. The trial court has not been presented facts necessary to determine whether the Ball #1-24 well was profitable at the time of Staab's release. Moore's claim in equity based upon allegations of unclean hands against Oil Valley has not been determined by the trial court.

¶91 This Court will not make a first instance adjudication of rights and obligations of parties to a lease and top-lease when the facts were not developed in a trial court equitable proceeding brought to adjudicate those rights and obligations based upon all of the circumstances.

¶92 The opinion of the Court of Civil Appeals is vacated. Prevailing party status for the purpose of an attorney fee is determined in the trial court. We reverse the order granting Moore a partial summary adjudication and remand for additional proceedings consistent with this opinion.

¶93 CONCUR: KANE, C.J.; ROWE, V.C.J.; KAUGER, WINCHESTER, EDMONDSON, GURICH, DARBY, and KUEHN, JJ.

¶94 NOT PARTICIPATING: COMBS, J.

FOOTNOTES

Magnolia Petroleum Co. v. St. Louis-San Francisco Ry. Co., 1944 OK 280152 P.2d 367Stewart v. Amerada Hess Corp., 1979 OK 145604 P.2d 854Pack v. Santa Fe Minerals, 1994 OK 23869 P.2d 323Barby v. Singer, 1982 OK 49648 P.2d 14Durkee v. Hazan, 1968 OK 96452 P.2d 803

In re Guardianship of Berry, 2014 OK 56335 P.3d 779

See, e.g., Lewis G. Mosburg, Jr., Ownership and Transfer of Title to Oil and Gas, Handbook on Petroleum Land Titles (1976), printed in, Eugene Kuntz, Oklahoma Law of Oil & Gas, 107 (1983) (commenting a division as to depth in an assignment is common, and advising that an assignment naming or distinguishing a particular formation or strata may be insufficient and specifying a particular well at a specific depth is favored).

Voiles v. Santa Fe Minerals, Inc., 1996 OK 13911 P.2d 1205French Energy, Inc. v. Alexander, 1991 OK 106818 P.2d 1234

Id., at 3.

Id., at 4.

Colonial Royalties Co. v. Keener, 1953 OK 385266 P.2d 467Manual of Oil and Gas Terms, 472 (5th ed. 1981) (a "non-operating working interest" is "the working interest or fraction thereof in a tract the owner of which is without operating rights by reason of an operating agreement.").

Hinds v. Philips Petroleum Co., 1979 OK 22see also Mohoma Oil Co. v. Ambassador Oil Corp., 1970 OK 161474 P.2d 950

See, e.g., Indian Territory Illuminating Oil Co. v. Killingsworth, 1935 OK 93751 P.2d 505McCall v. Chesapeake Energy Corp., 2007 OK CIV APP 59164 P.3d 1120

Scurlock Oil Co. v. Getty Oil Co., 294 So.2d 810 (La.1974); Marshall v. Beekay Co., 2015-Ohio-238, 27 N.E.3d 1 (4th Dist. 2015).

Ridge Oil Co. v. Guinn Investments, Inc., 148 S.W.3d 143 (Tex.2004); Sasser v. Dantex Oil & Gas, Inc., 906 S.W.2d 599, 604 (Tex. App.--San Antonio 1995, writ denied).

Progressive Direct Ins. Co. v. Pope, 2022 OK 4507 P.3d 688

Western Heights Indep. Sch. Dist. No. I-41 of Okla. County v. State ex rel. Okla. Dep't of Educ., 2022 OK 79518 P.3d 531

Tres C, LLC v. Raker Resources, LLC, 2023 OK 13532 P.3d 1

Progressive Direct Ins. Co. v. Pope, 2022 OK 4507 P.3d 688de novo appellate review).

Progressive Direct Ins. Co. v. Pope, supra note 23; Widner v. Enerlex, Inc., 2013 OK 91313 P.3d 930de novo appellate review).

Reeds v. Walker, 2006 OK 43157 P.3d 100see also Spirgis v. Circle K Stores, Inc., 1987 OK CIV APP 45743 P.2d 682

Reeds v. Walker, 2006 OK 43157 P.3d 100

Oklahoma Pub. Employees Ass'n v. Oklahoma Dep't of Cent. Servs., 2002 OK 7155 P.3d 1072

Indep. Sch. Dist. No. 52 of Okla. Cty. v. Hofmeister, 2020 OK 56473 P.3d 475

Shawareb v. SSM Health Care of Okla., Inc., 2020 OK 92480 P.3d 894

Kincaid v. Black Angus Motel, Inc., 1999 OK 54983 P.2d 1016quoting Hadnot v. Shaw, 1992 OK 21826 P.2d 978

See, e.g., Miller v. Miller, 1998 OK 24956 P.2d 887de novo on appeal; and was presented for trial court adjudication by a motion to dismiss for failure to state a claim upon which relief could be granted.).

Claude C. Arnold Non-Operated Royalty Interest Props., L.L.C. v. Cabot Oil & Gas Corp., 2021 OK 4485 P.3d 817

Pitco Prod. Co. v. Chaparral Energy, Inc., 2003 OK 563 P.3d 541

Mercury Inv. Co. v. F.W. Woolworth Co., 1985 OK 38706 P.2d 523

In re Vose, 2017 OK 3390 P.3d 238

Rist v. Westhoma Oil Co., 1963 OK 126385 P.2d 791

Myers v. Missouri Pacific R. Co., 2002 OK 6052 P.3d 1014

Baytide Petroleum, Inc. v. Continental Resources, 2010 OK 6231 P.3d 1144Manual of Oil and Gas Terms, supra n. 14, at 70 (bottom lease is the existing lease covering a mineral interest upon which a second lease or top-lease has been granted).

Turben v. Douglas, 1919 OK 145183 P. 881

Fox v. Thoreson, 398 S.W.2d 88, 91 (Tex. 1966) (material omitted); see also Winn v. Nelson, 1983 OK 91670 P.2d 588Buckles v. Wil-McOil Corp., 1978 OK 137585 P.2d 1360Manual of Oil and Gas Terms, supra n. 14, 570-71 (primary term) (relying on Fox v. Thoreson, supra).

Hall v. Glamor, 2018 OK 59

Id., 2018 OK 39427 P.3d 1052Wickham v. Gulf Oil Corp., 1981 OK 8623 P.2d 613

Owens v. Owens, 2023 OK 12529 P.3d 905McDonald v. Amtel, Inc., 1981 OK 78633 P.2d 743Oklahoma Schools Risk Management Trust v. McAlester Public Schools, 2019 OK 3457 P.3d 997

Hall v. Galmor, supra note 41, at ¶36, 427 P.3d at 1067-68.

O'Neill v. American Quasar Petroleum Co., 1980 OK 2617 P.2d 181

XAE Corp. v. SMR Property Management Co., 1998 OK 51968 P.2d 12011949 OK 167207 P.2d 10961971 OK 61485 P.2d 2291944 OK 299152 P.2d 923

See, e.g., XAE Corp. v. SMR Property Management Co., supra n.46, at ¶31, 968 P.2d at 1208 ("Because the overriding royalty interest in the case at bar is an in-kind interest deliverable at the wellhead, the costs thereafter were properly deducted before the royalty was paid.").

Hall v. Galmor, supra n.41, at ¶21, 427 P.3d at 1063.

Bixler v. Lamar Exploration Co., 1987 OK 15733 P.2d 410

Manual of Oil and Gas Terms, supra n.14, 817 (A "washout" is an "[e]limination of an overriding royalty or other share of the working interest by the surrender of a lease by a sublessee or assignee and subsequent reacquistion of a lease on the same land free of such interest.") (relying in part on Berman v. Brown, 224 La. 619, 70 So.2d 433 (1954) and Sunac Petroleum Corp. v. Parkes, 416 S.W.2d 798, 804 (Tex. 1967)). The term "washout" is used in various contexts in the oil and gas industry. See, e.g., ANR Prod. Co. v. Westburne Drilling, Inc., 581 F.Supp. 542, n.1, 1545 (D.Colo.1984) (A "washout" may also refer to "[a] hole in a drill pipe or tool joint."').

Sawyer v. Guthrie, 215 F.Supp.2d 1254, n.2, 1258 (D. Wyo. 2002).

See, e.g., Lewis G. Mosburg, Jr., Contracts Used in Oil and Gas Operations, 194-196, 222-223 (1981) (American Ass'n of Petroleum Landmen, Model Form Operating Agreement, Form, 610, 1956 (Non-Federal Lands) (revised in part, 1967) and Form 610-1977 (revised 1977) (a preferential right of purchase if any party to the agreement desires to surrender or sell its interest, and a right to participate in renewal or extension of leases if any party secures a participation right); John R. Reeves, Changes to the A.A.P.L. Form 610 Model Form Operating Agreement, printed in Mosburg, supra, 128-173, 152-153 (history of Form 610, 1977 changes to Form 610, and explaining a well which has produced may not to be plugged and abandoned without the consent of all parties and distinguished rights based upon whether a party had been "fully reimbursed," and also advising parties may need to add a provision for when parties have not been fully reimbursed and a producing well becomes a "non-commercial well" ); cf. Mosburg, supra, 75-104, Conventional Farmout Agreement with Operating Agreement, Exhibit "D" Assignment (a reassignment to assignor if an assignee "should elect to surrender, abandon or release all or any part of its rights in said lease acreage").

Otter Oil Co. v. Exxon Co., 834 F.2d 531, 533 (5th Cir. 1987)("The purpose of the extension-and-renewal clause is to prevent a 'washout,'" and protect the overriding royalty); EOG Resources, Inc. v. Hanson Production Co., 94 S.W.3d 697, 703 (Tex. App.-San Antonio 2002, no pet.) ("An overriding interest created by assignment does not survive the termination of the assigned lease unless the instrument creating the overriding interest provides an express provision to the contrary."); cf. Robinson v. North American Royalties, Inc., 463 So. 2d 1384 (La. Ct. ApP.3d Cir. 1985) (An "extension clause" is "commonly referred to as an anti-washout provision" and provides the overriding royalty interest will also apply to any new mineral leases.); 5 Eugene Kuntz, A Treatise on the Law of Oil and Gas § 63.2, at 229 (1991) (noting an "instrument by which the interest is created may provide that the overriding royalty will apply to modifications, renewals, and extensions of the lease").

SM Energy Co. v. Sutton, 376 S.W.3d 787, 791 (Tex. App. -- San Antonio 2012, pet. denied) ("It was the ORRIs' owners' burden to include an express provision to save their ORRIs from being extinguished by a partial termination that the lease expressly contemplated."); cf. Apache Deepwater, LLC v. McDaniel Partners, Ltd., 485 S.W.3d 900, 905 (Tex. 2016) ("Thus, in the case of a single lease, an overriding royalty ... will not survive termination of the leasehold it burdens unless the parties have expressly agreed otherwise.").

See, e.g., Lillibridge v. Mesa Petroleum Co., 907 F.2d 1031, 1035-36 (10th Cir. 1990) (applying Kansas law and discussing interests of the parties, concluding a new lease did not involve a confidential relationship, and explaining "the relief the court [in Kansas] extended to holders of royalty interests under terminated leases was plainly limited to cases involving fraud or collusion") (explaining Campbell v. Nako Corp., 195 Kan. 66, 402 P.2d 771 (1965) (explanatory phrase added)).

See, e.g., 2 Pomeroy's Equity Jurisprudence, § 924 (1905) ("Constructive Fraud Apparent from the Intrinsic Nature and Subject of the Transaction Itself--This class includes three principal subjects: 1. Inadequacy of consideration; 2. Contracts illegal because opposed to statute, or to public policy, or to good morals; and 3. Certain transactions which, in analogy with contracts, equity regards as contrary to public policy, an therefore illegal.").

Patel v. OMH Medical Center, Inc., 1999 OK 33987 P.2d 1185see also 15 O.S.2011 § 59

See, e.g., ENI Producing Props. Program Ltd. P'ship 1982--I, etc. v. Samson Inv. Co., 1991 OK 21977 P.2d 1086Silk v. Phillips Petroleum Co., 1988 OK 93760 P.2d 174

Amicus Curiae Brief in Support of Appellee's Petition for Certiorari, 4 (March 10, 2022) (quoting Kuntz, Law of Oil and Gas § 55.3.).

Amicus Curiae Brief, at 3 (explanation added).

See, e.g., Bank of Meno v. Coulter, 1923 OK 1144221 P. 495Equity as Meta-Law, 130 Yale L.J. 1050, 1076 (2021) ("[E]quity has always had a special role in combatting opportunism... this went under the banner of 'constructive fraud'-- activities that might not technically be fraud but that carried a danger of the same kind of harm... [including] ... unconscionability, denials of injunctions, [and] unclean hands.") (material omitted).

Tulsa Cty. Budget Bd. v. Tulsa Cty. Excise Bd., 2003 OK 10381 P.3d 662

Amicus Curiae Brief in Support of Appellee's Petition for Certiorari, unnumbered pg. 2-3. (March 25, 2022).

See, e.g., Henry L. McClintock, Handbook on the Principles of Equity, (2d ed. 1948) ("It was the general rule that allegations contained in the other parts of the bill could not cure the failure to allege some fact essential to plaintiff's success in the stating part of the bill.").

Gaylord Entertainment Co. v. Thompson, 1998 OK 30958 P.2d 12812 O.S.2011 §201012 O.S.2011 § 2010

Wagner v. First Horizon Pharm. Corp., 464 F.3d 1273, 1279 (11th Cir. 2006); In re Smith, 489 B.R. 875, 891 (Bankr. M.D.Ga. 2013).

Wilson v. Webb, 2009 OK 56cf. Bell Atlantic Corp. v. Twombly, 550 U.S. 544, 555, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007) (Fed. R. Civ. Pro. 8(a)(2) "requires only 'a short and plain statement of the claim showing that the pleader is entitled to relief,' in order to 'give the defendant fair notice of what the ... claim is and the grounds upon which it rests.'").

Torres v. Seaboard Foods, LLC, 2016 OK 20373 P.3d 1057amicus curiae may not expand the record on appeal); City of Okla. City v. State ex rel. Okla. Dept of Labor, 1995 OK 107918 P.2d 26amicus curiae's participation is confined to the issues raised by the parties).

See, e.g., Farrington v. Allsop, 670 N.E.2d 106 (Ind.Ct.App.1996), (holding constructive fraud might give rise to an equitable estoppel, and stating "The basis for the doctrine of equitable estoppel is fraud, either actual or constructive, on the part of the person estopped.'") (quoting Lawshe v. Glen Park Lumber Co., 176 Ind.App. 344, 375 N.E.2d 275, 278 (1978); In re Cancellation of Stabio Ditch Water Right on Spearfish Creek, 417 N.W.2d 391 (S.D. 1987) ("The essential element of equitable estoppel is fraud.").

See, e.g., Maness v. K&A Enterprises of Mississippi, LLC, 250 So. 3d 402, 412 (Miss. 2018) ("fraud is not required for equitable estoppel to be applied") (citing PMZ Oil Co. v. Lucroy, 449 So.2d 201, 207 (Miss. 1984) (while a fraudulent intent to deceive may give rise to an estoppel, a substantial inequity may arise justifying an estoppel without an original subjective intent to deceive); cf. 2 Pomeroy's Equity Jurisprudence, supra n. 58 at § 803 (the essence of equitable estoppel is not the same as fraud, but "[i]t is accurate, therefore, to describe equitable estoppel, in general terms, as such conduct by a party that it would be fraudulent, or a fraud upon the rights of another, for him afterwards to repudiate and to set up claims inconsistent with it.").

Notten v. Mensing, 3 Cal.2d 469, 45 P.2d 198, 202 (1935).

A--Plus Janitorial & Carpet Cleaning v. Employers' Workers' Comp. Ass'n, 1997 OK 37936 P.2d 9161995 OK 126911 P.2d 25712 O.S.2021 § 2009

McKee v. Grimm, 1925 OK 425238 P. 835

Plains Petroleum Corp. v. Fine, 1935 OK 82551 P.2d 284

Amicus Curiae Brief In Support of Appellee's Petition for Certiorari, n.3, unnumbered pg. 2 (March 25, 2022) (citing "Defendant Clay E. Moore's Reply and Response to Plaintiff Oil Valley's Response and Counter-Motion for Summary Judgment and Brief in Support at pgs. 4-6.").

Western Heights Indep. Sch. Dist. No. I-41 of Okla. County v. State ex rel. Okla. Dep't of Educ., supra n.21, at ¶23, 518 P.3d at 541 (Court does not make first-instance determinations of disputed issues of either law or fact in the exercise of its appellate jurisdiction.).

See, e.g., Hall v. Galmor, supra n. 41, at ¶40, 427 P.3d at 1069 (discussing James Energy Co. v. HCG Energy Corp., 1992 OK 117847 P.2d 333

Smedsrud v. Powell, 2002 OK 8761 P.3d 891Parker v. Elam, 1992 OK 32829 P.2d 677